# AMENDED AND RESTATED TURN-KEY FACILITY DEVELOPMENT AGREEMENT

This **AMENDED AND RESTATED TURN-KEY FACILITY DEVELOPMENT AGREEMENT** (the "Agreement") is entered into as of the day of December, 2011 ("the Effective Date") by and between the **KEWADIN CASINOS GAMING AUTHORITY** ("Gaming Authority"), a duly authorized entity created under the laws of the **SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS**("Tribe"), a federally-recognized Indian Tribe, with its offices located at 523 Ashmun Street, Sault Ste. Marie, MI 49783, and JLLJ Corporation, with offices located at 9000 Page Avenue, Jackson, MI 49201 (the "Developer") (the Gaming Authority and the Developer are sometimes hereinafter collectively the "Parties"), the parties intending by the execution of this instrument to amend and restate the Turn-Key Facility Development Agreement between the parties dated November 19, 2009 in its entirety as follows:

## RECITALS

A.     The Tribe is a federally recognized Indian tribe eligible for the special programs and services which the United States provides to Indians because of their status as Indians, and possesses sovereign powers of self-government. The Gaming Authority is a governmental instrumentality of the Tribe established by Chapter 94 of the Sault Ste. Marie Tribal Code, separate and distinct from the Tribe, and enjoys sovereign immunity to the same extent as the Tribe.

B.     The Gaming Authority intends to develop, operate and maintain a licensed gaming establishment to be called "New Boston Gaming Enterprise" (the "Facility"),on mutually acceptable real estate (the "Real Property") located in the Township of Huron, Wayne County, Michigan(the "Project") on Indian lands pursuant to and in accordance with the terms and provisions of the Indian Gaming Regulatory Act (IGRA). The Gaming Site will consist of lands purchased by the Tribe with principal or interest from the Tribe's Self-Sufficiency Fund, as contemplated by Section 108 of Pub. L. 105-143 (Dec. 15, 1997), the Michigan Indian Land Claims Settlement Act. The Real Property will be purchased by the Tribe in fee or restricted fee or conveyed to the United States in trust for the Tribe.

C.     The Tribe has determined that the Facility will be an important tribal government project which is intended to improve the economic condition of the Tribe and its members, increase tribal revenues, enhance the Tribe's economic self-sufficiency, and enable the Tribe to better serve the social, economic, educational and health needs of the Tribe's members, several thousand of whom reside in the general area of the project.

D.     This Agreement is intended to outline the rights and obligations of the Parties during the Term hereof.

E.     The Gaming Authority requires assistance in its efforts in the development, financing, construction and opening of the Facility.

Exhibit 1

F.     The Developer has the experience, expertise and resources to assist the Gaming Authority with the tasks stated above, and the Gaming Authority has requested the Developer's assistance with the performance of such tasks.

G.     The Developer has agreed to provide the Gaming Authority with the requested assistance, subject to the terms and conditions of this Agreement and certain other related documents, contracts or instruments executed by the Parties pursuant to this Agreement, all of which will be approved at a future date. This Agreement, along with those documents, and any other documents evidencing or securing these transactions which the Parties enter into in the future, pursuant to and in accordance with the terms and provisions hereof, are collectively referred to herein as the "Transaction Documents."

H.     This Agreement and the other Transaction Documents provide for the Developer to assist the Gaming Authority with the development, financing, construction and opening of the Facility. The Gaming Authority shall have the sole and exclusive authority to operate, manage and maintain the Facility, the Equipment and all gaming activities conducted by the Gaming Authority, and nothing herein is intended to be or shall be construed as constituting a contract for management services as contemplated by IGRA, 25 U.S.C. § 2711 (or any successor or related statute or regulation). The Parties acknowledge that neither Developer nor any affiliate thereof is to have any management authority or responsibilities with respect to the Facility, the Gaming Authority, the Equipment or any gaming activities conducted by the Gaming Authority. Further, the Parties acknowledge that neither Developer nor any affiliate thereof shall have any proprietary interest whatsoever in the Facility, Gaming Authority, the gaming activities conducted thereby, or have any right to possess, control or encumber the Facility, the Gaming Authority, or any gaming activities conducted thereby, or any of the equipment owned by the Gaming Authority and installed in the Project (the "Equipment") or leased by the Gaming Authority, except in the limited instance and scope of Developer exercising rights pursuant to a separate security agreement as a secured party in and to the Operating Profits generated by the Facility and in the Equipment pursuant to the Transaction Documents.

I.     The Parties acknowledge that development and funding for the Facility and any Temporary Facility will include, but not be limited to (i) petitioning the United States to acquire title to the Real Property in trust for the benefit of the Tribe, (ii) securing any necessary determination that the Real Property constitutes "Indian Lands" of the Tribe and are gaming-eligible pursuant to IGRA, including Section 20 thereof, (iii) asserting through litigation the Tribe's legal right to undertake the above activities, including defending challenges to various aspects of the land-in-trust process, the "Indian Lands" determination, and challenging the jurisdiction of the State over the Real Property and the Facility and any gaming and operations thereon, (iv) obtaining any and all necessary licenses, permits and approvals required from any governmental authority under all applicable law in connection with the design, development, financing, and construction of the Facility or the lease and installation of the Equipment for use within the Facility, (v) the design, construction, equipping, opening and operation of any temporary gaming facility on the Real Property, and (vi) advancing as a limited recourse loan or loans the funds necessary to accomplish all necessary and appropriate pre-construction activities and presenting proposals for leasing of Equipment on mutually agreeable terms.

Exhibit 1

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby mutually acknowledged by the Parties, the Parties hereby agree, as of the Execution Date, as follows:

## ARTICLE I
### PRE-CONSTRUCTION PERIOD AND TEMPORARY FACILITY PERIOD

**Section 1.1: _Definition of Pre-Construction Period._** As used herein, the phrase "Pre-Construction Period" shall mean the period of time commencing on the Effective Date and ending on the day of commencement of construction activities on any gaming facility on the Real Property.

**Section 1.2:** _Pre-Construction Period and Expenses._

**Section 1.2.1:** _Expenses incurred prior to Effective Date._ The Gaming Authority acknowledges that Developer has advanced, prior to the Effective Date, certain funds in the amounts described on Exhibit A in furtherance of the development of the Facility (the "Pre-Effective Date Expenses"). Simultaneous with execution of this Agreement, the Gaming Authority shall execute a promissory note in the form attached hereto as Exhibit B to evidence repayment of the Pre-Effective Date Expenses (the "Pre-Effective Date Expenses Note"). The Pre-Effective Date Expenses Note shall clearly state that it is assignable by the Developer, that the sole source of repayment shall be the Operating Profits and that it is subject to the limitations on repayment referenced in Section 1.2.6 of this Agreement.

**Section 1.2.2:** _Pre-Construction Period Expenses._ Including the Pre-Effective Date Expenses, Developer agrees to advance an amount not to exceed $5,000,000 for the purpose of acquiring the Real Property and funding those other expenses referenced in Recital I to this Agreement (collectively, the "Pre-Construction Expenses"). Such Pre-Construction Period Expenses shall be incurred only pursuant to a budget approved in writing by the Parties and shall be repaid by the Gaming Authority pursuant to the form of promissory note in the form attached as Exhibit B (the "Pre-Construction Note"). The Pre-Construction Note shall clearly state that it is assignable by the Developer, that the sole source of repayment shall be the Operating Profits and that it is subject to the limitations on repayment referenced in Section 1.2.6 of this Agreement.

**Section 1.2.3:** _Temporary Facility Expenses._ In addition to the Pre-Construction Expenses, the Developer agrees to advance an amount not to exceed an additional $5,000,000 for the purpose of renovating and making capital improvements ("Temporary Facility") on the Real Property and acquiring Equipment at the Temporary Facility (collectively, the "Temporary Facility Expenses"). The Temporary Facility Expenses shall be incurred only in accordance with a budget to be agreed upon by the Parties and shall be repaid pursuant to the terms of a promissory note in the form attached as Exhibit B (the "Temporary Facility Note"). The Temporary Facility Note shall clearly state that it is assignable by the Developer, that the sole source of repayment shall be the Operating Profits and Equipment and that it is subject to the limitations on repayment referenced in Section 1.2.6 of this Agreement. Given the essential interrelationship between financing the Temporary Facility Expenses and leasing the Equipment

Exhibit 1

to be installed in the Temporary Facility, Developer shall also have the preferred right to present proposals to the Tribe and/or Gaming Authority for lease of Equipment to be installed in the Temporary Facility on customary commercial terms.

**Section 1.2.4:  _Term Note._** Simultaneously with the opening of the Temporary Facility for business to the public, the Gaming Authority shall execute a promissory note substantially in the form attached hereto as Exhibit C (the "Term Note"). The face value of the Term Note shall be equal to the amounts due under each of the Pre Effective Date Note, the Pre-Construction Note and the Temporary Facility Note, plus all interest accrued to date thereon. The Term Note shall be amortized over the initial term of the Agreement as set forth in Section 7.1 and shall specify that it is assignable by the Developer, that the Developer's sole source of repayment for amounts due shall be the Operating Profits and Equipment and that it is subject to the limitations on repayment referenced in Section 1.2.6 of this Agreement. Parties further agree that the total sum of principal which the Tribe or the Gaming Authority will be entitled to borrow and obligated to repay under the Pre-Effective Date Expenses Note, the Pre-Construction Note and the Temporary Facility Note is not more than ten million dollars ($10,000,000). Developer may provide additional funds for completion of the Temporary Facility, but neither the Tribe nor the Gaming Authority will be obligated to repay such additional funds without its prior written consent given in its sole discretion.

**Section 1.2.5:  _Structure and Equipment._**  Developer, pursuant to and in accordance with the terms and provisions of this Agreement and the Transaction Documents, hereby agrees to provide such consultation and support as is requested by the Gaming Authority to assist the Gaming Authority to design, develop, construct and open the Facility on the Gaming Site, and to lease and install the Equipment in the Facility for use by the Gaming Enterprise, all in conformity with the Gaming Authority's plans, designs, specifications and directions, applicable laws and the terms and provisions of the Transaction Documents. Upon the Gaming Authority's selection of the Architect, Engineer, Designer and General Contractor pursuant to the terms and provisions of this Agreement, Developer will provide such evidence of the financing obligated hereunder as may be reasonably requested.

**Section 1.2.6:  _Repayment._** The Parties expressly acknowledge and agree that the Pre-Effective Date Expenses, Pre-Development Period Expenses and the Temporary Facility Period Expenses shall each constitute loans from the Developer to the Gaming Authority; provided, however, that the Parties further acknowledge and agree that such loans shall be evidenced by the Promissory Notes referenced in Sections 1.2.1, 1.2.2 and 1.2.3 respectively, which shall specify that financing is non-recourse financing, that the Tribe shall have no obligation whatsoever to repay any portion thereof and that payment will flow only from the Operating Profits as defined in Section 4.1.3 of this Agreement derived from the operation of Temporary Facility and the Facility. The Parties further expressly acknowledge payments made to satisfy such loans shall flow only from the "Operating Profits" derived from the Gaming Authority from operations at the Temporary Facility and the Facility. Total Fixed Charge Coverage Ratio must be greater than 1:00 to 1:00 before repayment can be executed on a following twelve fiscal month basis, prorated for the first twelve months of operation (See Exhibit D).

Exhibit 1

-4-

# ARTICLE 2
## CONSTRUCTION OF TEMPORARY FACILITY AND FACILITY

**Section 2.1:** _**Construction and Development Period.**_  The Parties acknowledge and agree that the period from the commencement of construction forward to the opening of the Temporary Facility shall be the "Temporary Construction and Development Period," and that certain activities related to the Temporary Construction and Development Period commenced prior to the execution of this Agreement.  The Parties further acknowledge and agree that the period from the commencement of construction forward to the opening of the Facility shall be the "Permanent Construction and Development Period."

**Section 2.2:** _**Consultation by Developer.**_  Construction will be done in two phases as determined by mutual agreement between the Parties: Phase 1 – construction of the Temporary Facility and Phase 2 – construction of the permanent Facility (the Temporary Facility and the permanent Facility are herein referred to as the "Facilities").  Developer, pursuant to and in accordance with the terms and provisions of this Agreement and the other Transaction Documents, hereby agrees to provide such consultation and support as is necessary to assist the Gaming Authority to develop, construct and open the Temporary Facility and the Facility on the Real Property and lease and install the Equipment in such Facilities for use by the Gaming Authority, all in conformity with the Gaming Authority's plans, designs, specifications and directions and the applicable laws and the terms and provisions of the Transaction Documents.  The Gaming Authority shall select, with the consultation of the Developer, the architect, engineer, designer and general contractor pursuant to the terms and provisions of this Agreement for each Phase of development.  Upon such selection, Developer will provide such evidence of the financing obligated hereunder as may be reasonably requested.

**Section 2.2.1:** _**Selection of General Contractor; General Contractor Warranties**_  The Gaming Authority shall select a general contractor (the "General Contractor") for each Phase, in accordance with paragraph 2.2, to perform all construction activities at the Facility including, but not limited to, renovating and installation of capital improvements to the Real Property.  To the Gaming Authority and the General Contractor shall enter into an agreement for each Phase (the "Owner/Contractor Agreement") consistent with and incorporating provisions required by the agreement of the Parties, which agreement will integrate among other items, the terms described in this Article 2.

> The Owner/Contractor Agreement shall provide that the General Contractor warrants that the work performed thereunder will be completed in a workmanlike manner and will be warranted to be free of defects for a period of not less than twelve (12) months after the Facility is open for business.  The Owner/Contractor Agreement shall also provide that the General Contractor warrants that all construction and installation meets or exceeds (i) all regional construction industry standards, (ii) all standards contained in any applicable law, and (iii) all State or local codes, ordinances or standards which would apply to the Facility if title to such Site was not held by the United States in trust for the benefit of the Tribe.  The Owner/Contractor Agreement shall also contain such warranties as would be required if title to the Gaming Site were not held in trust by the United States for the benefit of the Tribe.  The Owner/Contractor

Exhibit 1

Agreement shall provide that all warranties shall apply to all subcontractors as well, shall run from the date an architect provides the Gaming Authority with a certificate of substantial completion, and shall require the General Contractor and the subcontractors to repair any construction defects which violate any warranty. The Owner/Contractor Agreement shall require the General Contractor to ensure that all subcontract agreements shall contain the identical warranties as agreed to by the Gaming Authority and the General Contractor with respect to such phase of the project.

> Section 2.2.2: *Retainage.* The Owner/Contractor Agreement for each Phase shall provide for a retainage in the amount of ten percent (10%) of the amount to be paid to the General Contractor, or such greater amount as is determined to be commercially reasonable, and that such retainage shall be held by the Gaming Authority until a reasonable time following final walk-through for the Phase. If, within forty-eight (48) hours after written notice of a construction defect, such defect has not been repaired, the Gaming Authority may use the retainage to complete such repairs. After the Temporary Facility opening date, or the Facility Opening Date, as the case may be, and within forty-eight (48) hours after receipt of a written notice from the General Contractor requesting release of the retainage and satisfaction of all known construction defects and relevant terms and conditions of the Owner/Contractor Agreement and any Transaction Document, any and all remaining retainage shall be paid to the general Contractor.

> Section 2.3: *Financing.* Developer shall make or arrange for an interim construction loan to the Gaming Authority, in an amount sufficient to fund the Gaming Authority's budget for the Permanent Construction and Development Period through such time as a permanent construction loan, or a related bridge or interim loan, is closed. Further, at the option of the Gaming Authority, Developer shall arrange for a third party to make a permanent construction loan for the Facility and for purchase or lease of all Equipment to be used in the Facility on customary market terms. Developer warrants and represents to the Gaming Authority that any permanent construction loan shall be in an amount sufficient to pay all costs and expenses included in the Term Note and shall be upon terms and conditions consistent with then prevailing regional industry standards; provided, however, that neither the permanent construction loan nor any of the financing agreements or notes contemplated herein, shall, under any circumstances, place at risk any assets of the Tribe or the Gaming Authority and only those assets of the Tribe or Gaming Authority in the Operating Profits and Equipment and those other terms contained in the Notes to be issued to the Developer pursuant to Sections 1.2.1, 1.2.2, 1.2.3 and 1.2.4 shall be in such permanent construction loan. Given the essential interrelationship between financing the construction of the Facility and leasing the Equipment to be installed in the Facility, Developer shall also have the preferred right to present proposals to the Tribe and/or Gaming Authority for lease of Equipment to be installed in the Facility on customary commercial terms.

> Section 2.4: *Consultation*

> > Section 2.4.1: *Representatives*

> > > Section 2.4.1.1: *New Boston Gaming Enterprise's Development Coordinator.*

Exhibit 1

The Gaming Authority shall assign a three-Member Committee to oversee the construction of the Facilities and installation of the Equipment for each Phase. Those persons appointed shall be qualified and experienced in working as a liaison in economic development activities and in the design, development, construction, equipping and commencement of operations of an Indian gaming facility. The Committee shall also appoint an enterprise employee to be a development coordinator for the Facility (the "Development Coordinator"). The Development Coordinator position shall be funded by pre-development funds to coordinate the participation and response of the Gaming Authority in all aspects of the design, development, construction and opening of the Facility, as well as the identification, selection, lease and installation of the Equipment in the Facility for use by the Gaming Authority, and shall consult with the Gaming Authority for the purpose of providing them with information reasonably necessary to make informed decisions regarding any and all relevant matters.

Section 2.4.1.2:  *Project Manager.*  Developer warrants and represents that it will assign a project manager to oversee the performance of the Developer's obligations hereunder, and to serve as Developer's primary liaison with the Gaming Authority(the "Project Manager") to assure that the Facility is designed, developed, constructed and opened, and that the necessary Equipment is purchased or leased and installed within the Facility for use in the Project, pursuant to and in accordance with the plans, designs, specifications and directions of the Gaming Authority, all applicable law, and the terms and provisions of the Transaction Documents. The Project Manager shall be an employee of the Developer and his/her salary and expenses shall be at the sole expense of the Developer and shall not be paid for or reimbursed in any way by the Project including, but not limited to, inclusion of the position in the Temporary Construction and Development Budget or the Permanent Construction and Development Budget (as defined herein) or as a Developer expense under Section 1.2 or any other Section of this Agreement.

Section 2.4.2:  *Meeting.*  The Development Coordinator and the Project Manager (collectively, the "Representatives") shall meet as often as necessary (but no less frequently than once per week unless the Parties otherwise agree) to provide ongoing exchanges of information with respect to the design, development, construction and operation of the Facility and the selection, purchase or lease and installation of the Equipment within the Facility for use in the Project. The Development Coordinator shall be responsible for communicating all necessary information to the Gaming Authority so as to allow the Gaming Authority to make informed decisions as necessary and required. The Development Coordinator shall also have the right to inspect all construction and development activities and invoices. The Representatives may meet by teleconference.

Section 2.5:  *Architect and Engineer.*

Section 2.5.1:  *Approvals.*  In addition to the General Contractor and the Development Coordinator, the Developer in consultation with the Gaming Authority shall develop a list of qualified candidates to serve as, respectively, the architect (the "Architect") and engineer (the "Engineer") for the design, development and construction of the Facility, and as appropriate solicit bids for their services. The Gaming Authority, with the input of the Developer shall review the candidates and make its final choice in selecting such professionals.

Exhibit 1

**Section 2.5.2:** **_Preparation of Agreement_.** Upon the Gaming Authority's selection of any Architect, Engineer, designer, General Contractor and, the Gaming Authority, using reasonable business judgment will negotiate, execute and enter into such agreements as are reasonably required to secure the services of the selected professionals. Without limiting the generality of the foregoing, any agreements between the Gaming Authority and the professionals shall be provided to the Developer prior to execution to review and comment, and to assure consistency with the Transaction Documents.

**Section 2.5.3:** **_Design Standards_.** Neither the State nor any political subdivisions thereof has the power to enforce any building, fire, energy or life/safety code or requirements which would apply if the State or such political subdivision had jurisdiction over the Facility. The Gaming Authority has determined that the application of the standards and methods included in such codes and requirements is in its best interests and those of the Facility and shall cause the agreements with the Architect and the Engineer to require the Architect and Engineer to design, develop and construct the Facility, and to install the Equipment within the Facility for use by the Gaming Authority to comply in all material respects with State and local standards and methods that would otherwise be applicable, provided that if for any reason an applicable standard cannot be determined as provided, then the Parties shall apply standards and methods set forth in the 1997 Uniform Building Code, as amended or superseded at the time the Facility is constructed. Using qualified inspectors, Developer, the Gaming Authority and a third party lender may conduct such inspections as are necessary to ensure compliance in all material respects with these standards. The Facility is on Indian lands and is subject to the jurisdiction and police power of the Sault Ste. Marie Tribe of Chippewa Indians. Nothing in this Section shall be deemed to grant the State or any political subdivisions thereof any jurisdiction over any property owned by or held for the benefit of the Tribe, including, without limitation, the Facility, or the right to apply or enforce any state laws such as building, fire, energy or life/safety code or requirements with respect to such property.

**Section 2.5.4:** **_Approval of Plans, Designs and Specifications_.** Upon receipt from the Architect and Engineer retained by the Gaming Authority of detailed plans, designs and specifications for the Facility (which plans, designs and specifications may be submitted in stages, rather than all at one time), the Gaming Authority shall provide such plans, designs and specifications to the Developer for their comment, assistance and input. The Development Coordinator shall, within five (5) Business Days after receipt thereof, review the plans, designs and specifications with the Gaming Authority. If the submitted plans, designs and specifications are not rejected by the Development Coordinator or the Gaming Authority within Twenty (20) Business Days of receipt, they shall be deemed approved. One requested extension of time shall be automatically granted, and shall commence upon the date of the extension request. Upon the approval of such plans, designs and specifications, the Gaming Authority shall notify the Architect and Engineer that such plans, designs and specifications have been approved. Construction of the Facility shall begin at the discretion of the Gaming Authority regardless of the status of plans, designs and specifications.

**Section 2.5.5:** **_Payment and Performance Bonds_.** Unless the Parties determine otherwise, and to the extent required by any Lender, the Owner/Contractor Agreement shall require the General Contractor to provide to the Gaming Authority, Developer and any third

Exhibit 1

party lender a payment bond and a performance bond (the "Contractor's Bonds") in the full amount of the development and construction costs of the Temporary Facility and the Facility (as reflected in the approved budget), and the purchase and the performance of the work under the Owner/Contractor Agreement and issued by a surety licensed in Michigan reasonably acceptable to the Gaming Authority, Developer and third party lender, each of whose counsel shall review and approve the form of the Contractor's Bonds.

Section 2.5.6: *Contract Terms*. To enable the Gaming Authority to maintain construction and development costs within budget, the Gaming Authority shall have the right to require that any agreements with the Architect or the Engineer or the Owner/Contractor Agreements provide for either a fixed fee or a guaranteed maximum fee in an amount reasonably established by the Parties.

Section 2.5.6.1: *Insurance*. The Owner/Contractor Agreement shall require that the General Contractor and all subcontractors provide to Gaming Authority, Developer and any third party lender evidence of insurance as follows, which coverage is either required in the ordinary course of financing by commercial lenders or is otherwise commercially reasonable:

a. Workers Compensation, in accordance with State law, provided, however, that except as otherwise provided under applicable law, nothing herein shall be deemed to grant the State or any political subdivisions thereof any jurisdiction over any property owned by or held for the benefit of the Tribe, including, without limitation, the Facility, or the right to apply or enforce any laws relating to Workers Compensation to the Facility, the construction and development of the Facility or the installation of the Equipment within the Facility for use by the Gaming Authority.

b. Commercial General Liability with a combined single limit for bodily injury and property damage of not less than one million dollars ($1,000,000) per occurrence to protect the General Contractor and each subcontractor against claims for bodily injury or death and damage to the property of others.

c. Automobile Liability on owned and non-owned motor vehicles used on the Facility or in connection with the development and Construction of the Facility for a combined single limit for bodily injury or death and property damage of not less than one million dollars ($1,000,000) per occurrence.

d. Builder's Risk Insurance (fire and extended coverage) on all work in place and/or material stored at the Facility.

All insurance shall be carried with companies that are financially responsible and licensed or admitted to do business in the State of Michigan. Where applicable, policies for such insurance shall designate the Gaming Authority as well as the Developer and any third party lender as additional insureds and loss payees. The General Contractor and all subcontractors shall furnish to the Gaming Authority, Developer and any third party lender certificates of such policies prior to the commencement of their respective services, and at such other times as they

Exhibit 1

request.

**Section 2.5.6.2:** *Drawings.* The agreement between the Gaming Authority and the Architect (the "Architect Agreement") shall require the Architect to provide the Gaming Authority drawings that reflect the construction of the Temporary Facility or Facility as contemplated under the Architect Agreement. The Owner/Contractor Agreement, the Architect Agreement and any agreements with the Engineer selected by the Gaming Authority (the "Engineer Agreement") and shall require such professionals to provide the Architect with such information as the Architect shall reasonably require in the preparation of permanent as built drawings. The Owner/Contractor Agreement shall also provide that the General Contractor shall record on one set of contract drawings all changes from the installations originally indicated, and record final locations of underground lines by depth from grade and by accurate horizontal offset distances to permanent surface improvements such as buildings, curbs or edges of walks. Such requirements shall be included in all subcontracts at every tier. The Owner/Contractor Agreement shall provide that it is the obligation of the General Contractor to ensure delivery of as-built records prepared by subcontractors to the Architect.

**Section 2.5.6.3:** *Construction and Development Budget.* Attached hereto as Exhibits E and F are preliminary construction and development budgets for the installation of any capital improvements (including any construction renovation and site acquisition) and gaming and other equipment at the proposed Facilities (respectively, the "Preliminary Temporary Construction and Development Budget" and the "Preliminary Facility Construction and Development Budget). Unless the Gaming Authority shall direct otherwise, Developer acknowledges that the Facility shall be of the size, scope and quality evidenced by Exhibits E and F, which final budgets shall be mutually agreed upon in the interest of getting the Facilities completed. Simultaneously with the submission of plans, designs and specifications for the design, development and construction of each of the Facilities pursuant to Section 2.5.4 hereof, the Developer shall provide a revised budget for the design, development, construction and opening of the same, and the lease and installation of the Equipment within such of the Facilities for use by the Gaming Authority which shall be consistent with the submitted plans, designs and specifications, and which shall detail, by category, all construction and development costs and start-up expenses reasonably anticipated for such of the Facilities (the "Final Construction and Development Budget"). The Developer shall, within five (5) Business Days thereafter, review the submitted Final Construction and Development Budget with the Project Manager and the Gaming Authority and request approval thereof from the Gaming Authority. The failure of the Gaming Authority to reject a submitted Final Construction and Development Budget within Twenty (20) Business Days of receipt shall be deemed approval of such Budget. One requested extension of time shall be automatically granted, and shall commence upon the date of the extension request. Upon the approval of a Final Construction and Development Budget, the Gaming Authority shall notify the Architect and any Engineer that the Final Construction and Development Budget has been approved. Construction of the Facility shall not begin until a Final Construction and Development Budget for development and construction of the Facility has been approved under this Section, unless agreed to by the Parties in writing.

The Developer (through its Project Manager), shall supervise the progress of the design, development, construction and opening of the Facility, as well as the lease and the installation of

Exhibit 1

any Equipment within the Facility, and take such action as may be necessary to maintain costs within the Final Construction and Development Budget. In doing so, the Developer shall receive and review requests for payments from the Architect, the Engineer, the Designer and the General Contractor under the Architect, Engineering, Design or Owner/Contractor Agreement, respectively, and if requested copies of such requests shall be provided to the independent inspector of any party. If a request for payment complies with the terms of the applicable Agreement and the respective loan agreement which will be the source of payment funds, the Development Coordinator shall pay the same as required. Expenditures made under contracts previously approved and within the Construction and Development Budget shall not require further approval. In reviewing such requests, the parties shall be entitled to reasonably rely on any certification by the Architect, Engineer, Designer or General Contractor regarding such request, including any certification regarding the extent of work completed. The Development Coordinator shall maintain accurate records regarding each authorization for such payment, and notwithstanding the prior submission of all requests for payment, shall provide the Project Manager, the Gaming Authority and the Lender with a written monthly report of all such payments.

Section 2.6: _Additional Approvals_. In addition to those items set forth above, the Project Manager shall submit to the Gaming Authority for approval or disapproval, with copies to the Developer and the Lender:

a. Material revisions to the plans, designs and specifications approved pursuant to this Agreement, including, without limitation, the Construction and Development Budget;

b. Any change orders under the Architect, Engineering and Owner/Contractor Agreements; and

c. Any claim by the General Contractor for payment for additional work or for additional time to complete the work described in the Owner/Contractor Agreement.

The Project Manager shall submit with each request for approval of such revision, change order or claim, a written statement of the amount, if any, by which any category of the Construction and Development Budget will increase or decrease if such revision, change order or claim is approved, which approval shall not be unreasonably withheld.

Section 2.7: _Multiple Shifts_. With the prior approval of the Gaming Authority, the Final Construction and Development Budget may provide for the use of multiple shifts to complete the design, development and construction of the Facility and the installation of the Equipment within the Facility.

Section 2.8: _Selection, Delivery and Installation of Equipment_. The Gaming Authority shall select the Equipment for installation within the Facility, as well as the manufacturers, contractors, dealers or suppliers from whom the Equipment is purchased (the "Suppliers"). Notwithstanding the generality of the foregoing, the Developer shall work with the Suppliers to arrange for the purchase and leasing of the Equipment and to coordinate the delivery and installation of the Equipment within the Facility, ensuring that delivery and installation thereof is

Exhibit 1

-11-

in conformity with the approved specifications and orders for the Equipment, and is in time for the facility opening date and any training that must precede such date.

**Section 2.9:** *Access to Facility.* The Parties expressly and explicitly warrant and represent to each other that nothing contained herein or in any of the other Transaction Documents grants or conveys to Developer any possessory right or interest whatsoever in, or to, the Temporary Facility and the Facility. The Gaming Authority warrants and represents to Developer that it shall grant Developer, subject to the reasonable security concerns of the Tribe, its police department or the Gaming Authority, complete and unrestricted access to the Temporary Facility and the Facility during the applicable Construction and Development Period for the limited purpose of performing the obligations Developer has assumed and agreed to perform hereunder and pursuant to the terms and provisions of the other Transaction Documents. Notwithstanding the generality of the foregoing, nothing in this Section 2.9 is intended or shall be construed as a lease of the Temporary Facility or the Facility to Developer, an encumbrance of or security interest in the Facility by Developer, or a conveyance to Developer of a proprietary interest in the Temporary Facility, the Facility, or any Equipment located therein.

## ARTICLE 3
## TERM

**Section 3.1:** *Term.* The term of this Agreement (the "Term") shall begin on the Effective Date and shall end on midnight on the day preceding the 7th year of the Agreement. However, should the Facility open for business to the public ("Opening Date"), then the Term shall be extended to midnight on the day immediately preceding the 7th anniversary of the day the Opening Date. However, should the right to operate or construct the Temporary Facility or the Facility, or both, be enjoined by any court having jurisdiction to enjoin the same, then the Term shall be extended the same number days the operation or construction of such Facility is enjoined.

**Section 3.2:** *Early Termination.* The Parties expressly acknowledge and agree that the Gaming Authority may, in its sole discretion, terminate this Agreement at any time after the forty eight (48) month anniversary of the Opening Date and prior to the sixty (60) month anniversary of the Opening Date (subject to the same extensions of time provided in Section 3.1) by notifying Developer, in writing, of its desire to terminate this Agreement (the "Termination Notice"), by making full and complete payment of any outstanding obligations for payment of principal or interest under the Term Note, and making the Termination Payment (as defined herein) to Developer pursuant to and in accordance with the terms and provisions hereof. The amount of the Termination Payment shall be equal to Ninety percent (90%) of the figure calculated by multiplying (i) the average Development Fee accrued to Developer pursuant to and in accordance with the terms and provisions of the Transaction Documents for the twelve (12) months during which the Facility was operating immediately preceding the month in which the Gaming Authority delivers the Termination Notice to Developer, and (ii) the number of months remaining during the Term (including the month in which the Termination Notice is delivered to Developer).

Exhibit 1

# ARTICLE 4
# COMPENSATION

### Section 4.1: *Consideration*

**Section 4.1.1:** *Goods and Services provided during Pre-Construction Period.* The Parties hereby expressly acknowledge and agree that prior to the Pre Effective Date and during the Pre-Construction Period, Developer incurred or will incur those expenses set forth in Article 2 hereof.

**Section 4.1.2:** *Goods and Services During Construction Period.* As a result of Developer's performance of the obligations it has assumed and agreed to perform during the applicable Construction and Development Period, the Gaming Authority will have the sole and exclusive ownership of the Temporary Facility and the Facility, and all improvements therein, all of which will generate the revenue necessary to improve the economic conditions of the Tribe and its members and promote the establishment and maintenance of a strong, self-sufficient tribal government in furtherance of the Congressional goals of IGRA.

**Section 4.1.3:** *Determination to Pay Development Fee over Time.* The Gaming Authority, in the exercise of its reasonable business judgment, has determined that in lieu of a lump-sum payment to Developer in compensation for the risks, obligations and liabilities described herein, subject to the terms and provisions of this Article 4, the Gaming Authority shall pay Developer a fee, on a monthly basis over the period from the day the Temporary Facility opens for business to the public and, with respect to the Facility, the Opening Date to the end of the Term. As used herein, "Development Fee" is defined as fourteen percent (14%) of the Operating Profits of the Project in the prior month. As used herein, "Operating Profits" is defined as gross receipts and revenues derived from operations at the Temporary Facility or Facility, as the case may be, and less amounts (i) paid out as, or paid for, prizes; (ii) total Gaming-Related Operating Expenses; and (iii) other payments made to any governmental agency or entity for the purpose of providing a service in support of, in furtherance of, or in assistance to the Casino. Gaming-Related Operating Expenses shall include(i) revenue sharing under a Tribal-State compact as one may exist now or in the future, or by any Court order, settlement document or memorandum of understanding or any other document intended to provide a framework under which the Facility may operate, (ii) revenue sharing with the County of Wayne, Township of Huron and other units of local government under inter-governmental agreements, (iii) fees required to be paid to the National Indian Gaming commission, and (iv) Direct Costs. Direct Costs are costs which are directly attributable or allocable to gaming operations and include: salaries, wages and benefit programs for employees of the Facility; prizes, promotional incentives, and coupons; materials and supplies; utilities; remodeling repairs and maintenance of the facility; insurance and bonding; advertising and marketing, professional fees; security costs; reasonable travel expenses for the Project Manager and the Tribal Gaming Commission Representative to inspect and oversee the Facility; furniture, fixtures and Equipment lease payments; trash removal; costs of goods sold, training expenses and other similar general and administrative expenses. Gaming-related Operating Expenses shall not include (i) interest, depreciation and amortization and (ii) the Development Fee.

Exhibit 1

**Section 4.1.4:** *Calculation of Development Fee.* The Development Fee for any month shall be fourteen percent (14 %) of the Operating Profits of the Project for the prior month. The parties agree that one month after the opening date of Temporary Facility and the Facility and on the first day of each month thereafter, the Tribe will receive a minimum guaranteed monthly payment equal to the Development Fee. In the event that any Development Fee payment due under this Section 4.1.4 is not paid in full when due solely because the Operating Profits for such month is insufficient for the New Boston Gaming Enterprise to pay the Development Fee for the month as the same is due and payable, the unpaid portion of the Development Fee shall accrue, and shall be due and payable in the first month(s) in which the New Boston Gaming Enterprise has sufficient Operating Profits to pay such accrued unpaid Development Fee. In such month as sufficient Operating Profits exist, any accrued, unpaid Development Fees will be paid first, from earliest to most recent, prior to paying any currently due and payable Development Fee. Notwithstanding any other term or provision of this Agreement or the other Transaction Documents, and as provided for in Section 5.1.2 hereof, the failure to make a payment of the Development Fee in full when due solely because the Operating Profits for such month are insufficient, shall not be an Event of Default.

**Section 4.2:** *Payment of Development Fee.* The Development Fee shall be paid monthly, in arrears, on or before the 15th day of each month based on the Operating Profits in the immediately preceding month. The Development Fee shall accrue as of the date of opening the Temporary Facility or the Facility, as the case may be, to the public and throughout the entire Term of this Agreement. In the event that any Development Fee payment due under this Section 4.2 is not paid in full when due solely because the Operating Profits for such month is insufficient for the New Boston Gaming Enterprise to pay the Development Fee for the month as the same is due and payable, the unpaid portion of the Development Fee shall accrue, and shall be due and payable in the first month(s) in which the New Boston Gaming Enterprise has sufficient Operating Profits per Section 1.2.6 to pay such accrued unpaid Development Fee. In such month as sufficient Operating Profits exists, any accrued, unpaid Development Fees will be paid first, from earliest to most recent, prior to paying any currently due and payable Development Fee. Notwithstanding any other term or provision of this Agreement or the other Transaction Documents, and as provided for in Section 5.1.2 hereof, the failure to make a payment of the Development Fee in full when due solely because the Operating Profits for such month is insufficient, shall not be an Event of Default. No later than the fifteenth (15th) day of each month during the Term the Gaming Authority shall advise the other Parties of the Operating Profits for the preceding month, and provide Developer with such financial information as Developer reasonably requests to confirm that information.

**Section 4.3:** *Security.* Notwithstanding anything contained herein or by law to the contrary, the sole source of payment of the Development Fee, and security for the payment thereof, shall be the Operating Profits arising out of operation of the Temporary Facility and the Facility. The Developer shall also have a security interest in the Equipment owned but not leased by the Gaming Authority and located in the Temporary Facility or the Facility, as the case may be. Under no circumstances shall the Tribe or the Gaming Authority be responsible or liable in any way, shape or form for the payment of the Development Fee from any other source. Furthermore, the right of the Developer to receive the Development Fee shall be subordinate to

-14-

Exhibit 1

the payment of any required fees to the National Indian Gaming Commission. Finally, the Gaming Authority and the Developer shall execute all necessary further documentation to evidence payment of the Development Fee and the payment of such fee as referenced in this Section 4.3. The Gaming Authority represents and warrants that it will execute such instruments as the Lender, Developer or holder of cash deposits (the "Depository"), in their sole discretion, request in order to perfect the security interest in the Operating Profits and the Equipment. The parties expressly agree that, subject to the limited security interests granted to Developer, the New Boston Gaming Enterprise shall retain the sole proprietary interest in the gaming facility.

Section 4.4: *Carry-Forward Note:* In the event that, as of the expiration of the Term, the Gaming Authority will have insufficient Operating Profits to satisfy any or all of its obligations to Developer, including payment of the Development Fee, or payments under the Term Note, the Gaming Authority represents and warrants that it will, on the day prior to the expiration of the Term, execute a note in favor of Developer (the "Carry-Forward Note") which has as its principal amount the total accrued but unpaid obligations to Developer, and provides for an interest rate applicable to the Term Note as of the final day of the Term. The Note will further provide for payment to the Developer (not as an additional Development Fee, but as a payment on the Carry-Forward Note) of fourteen percent (14%) of the Operating Profits, as defined in Section 4.1.3, of the Facility each month thereafter until the Carry-Forward Note is satisfied. The Note shall also adopt all security provisions of this Agreement, including the limited waiver of sovereign immunity. The Carry-Forward Note is intended to be, and shall be deemed, a new obligation of the Gaming Authority, and not an extension of the obligations herein.

Section 4.5: *Other Transaction Documents.* Any cash management or depository agreement customary in such transactions will be intended to secure the performance of the Gaming Authority's obligations under the Transaction Documents. Notwithstanding any term or provision of such cash management or depository agreement to the contrary, the Parties expressly acknowledge and agree that all Development Fees shall be due and payable solely pursuant to the terms and provisions hereof and nothing contained in any cash management or depository agreement is intended or shall be construed to alter, modify, amend or reduce the Gaming Authority's obligations relative to the Development Fees.

## ARTICLE 5
## EVENTS OF DEFAULT

Section 5.1: *Events of Default.* Each of the following occurrences shall constitute an Event of Default under this Agreement and each of the other Transaction Documents (any such event, an "Event of Default"):

Section 5.1.1: Any material representation or warranty made by or on behalf of the Parties or contained in any report, certificate or other document furnished by or on behalf of the Parties pursuant to this Agreement shall prove to be false or misleading in any material respect when made.

-15-

Exhibit 1

**Section 5.1.2:** Failure of the Gaming Authority to make any payments within 15days of when they become due and payable pursuant to the terms hereof; provided, however, that the Gaming Authority's failure to make any payment due hereunder when due solely because the Operating Profits for such month is insufficient to make such payment shall not be an Event of Default.

**Section 5.1.3:** Any of the Parties shall default in the due observance or performance of any of its obligations, representations, warranties or covenants hereunder and shall not have commenced and diligently pursued the cure of such default pursuant to Section 5.2 of this Agreement including, but not limited to, the failure of the Developer to provide any financing as provided in this Agreement, subject to the extensions elsewhere provided in this Agreement.

**Section 5.1.4:** The existence of any Event of Default under any of the Transaction Documents.

**Section 5.1.5:** Any Party shall (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under the federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated insolvent or be the subject of an order for relief under any chapter of the Bankruptcy Code (11 U.S.C. § 101, et. seq.), (vi) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (vii) acquiesce to, or fail to controvert in a timely manner, any petition filed against it in an involuntary case under such bankruptcy laws.

**Section 5.1.6:** A case or other proceeding shall be commenced against, and without the application or consent of, the Gaming Authority in any court of competent jurisdiction, seeking the liquidation, reorganization, dissolution, winding up, or composition or readjustment of debts of the Gaming Authority, the appointment of a trustee, receiver, custodian, liquidator or the like of the Gaming Authority, or any similar action with respect to the Gaming Authority under the federal bankruptcy laws (as now or hereafter in effect) or any other laws relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, and such case or proceeding shall continue undismissed, or unstayed and in effect, for a period of sixty days, or an order for relief against the Gaming Authority shall be entered in an involuntary case under such bankruptcy laws.

**Section 5.1.7:** Failure of any Party to act in compliance with applicable law in relation to the Project, or otherwise with respect to the development or operation of any gaming facility.

**Section 5.2:** _Notice and Right to Cure_. Upon the occurrence of an Event of Default, the Party claiming the Event (the "Non-defaulting Party") shall provide the other Party (the "Defaulting Party") with written notice of such Event of Default which shall, among other things, specifically advise the Defaulting Party of the actions the Defaulting Party must take, or

Exhibit 1

-16-

refrain from taking, to cure such Event of Default. The Defaulting Party shall have fifteen (15) Business Days from and after the date of the written notice to cure such Event of Default (the "Cure Period"); provided, however, no notice of default shall be required for non-payment of any amounts due hereunder; provided, further, however, any Cure Period shall be automatically extended for a reasonable time, in all cases except for the failure to make a payment when due, if the Defaulting Party commences to cure such Event of Default within the Cure Period but cannot reasonably cure such Event of Default within such period. An Event of Default shall be deemed to continue until such Event of Default is cured to the written satisfaction of the Non-defaulting Party, which written instrument shall not be unreasonably withheld.

Upon the cure of an Event of Default to the written satisfaction of the Non-defaulting Party, which written satisfaction shall not be unreasonably withheld, the Transaction Documents shall be reinstated as though there had been no Event of Default. Notwithstanding the generality of the foregoing, upon the reinstatement of the Transaction Documents resulting from an Event of Default by the Gaming Authority, the term of each Transaction Document shall be extended by the number of days elapsed between the date the Event of Default occurred through the date the Event of Default was cured, as evidenced to Developer's written satisfaction, and the period so elapsed shall be considered to have tolled, rather than extended, the Term and that of the remainder of the Transaction Documents.

**Section 5.3:** _Rights and Remedies_.

**Section 5.3.1:** _Default by the New Boston Gaming Enterprise:_ Upon the occurrence of an Event of Default caused by the Gaming Authority which remains uncured under the terms of Section 5.2 hereof, Developer may, without notice or demand, exercise one or more of the following rights or remedies, subject to the limitations contained in Section 6.3 hereof.

**Section 5.3.1.1:** _Termination._ Upon the occurrence of an Event of Default, Developer may terminate this Agreement and the other Transaction Documents to which it is a party and the Gaming Authority's rights hereunder and thereunder. Termination under this provision shall terminate all Developer's obligations hereunder and give Developer the right to immediately accelerate all payments due to it from the Gaming Authority, including immediate application of the Early Termination provision of Section 3.2 hereof.

**Section 5.3.1.2:** _Preservation of Security._ The Gaming Authority expressly and explicitly agrees that the security interest granted Developer in and to the Operating Profits and the Equipment is Developer's sole and exclusive security for the performance of the obligations the Gaming Authority has assumed and agreed to perform under the Transaction Documents. The Gaming Authority shall have the absolute right to the use, operation, possession and control of the Facility, and any equipment located thereon during the Term, subject only to the limited security interests granted to Developer under this Agreement, any lease agreements and the remaining Transaction Documents. Upon the occurrence of an uncured Event of Default, Developer, to preserve Developer's security interest, shall request that a court of competent jurisdiction, as specified in Section 6.3.1 hereof, enter an order (i) depositing the Operating Profits into an escrow account pending resolution by the court of the amount of the Operating Profits to be transferred to a depository on a daily basis and paid or

Exhibit 1

allocated pursuant to and in accordance with the Transaction Documents, and that the condition of the Equipment is maintained by the Gaming Authority or (ii) providing for Court supervision and oversight of the transfer of the Operating Profits to a bank mutually agreeable to the Parties on a daily basis, payment or allocation of the Operating Profits pursuant to and in accordance with the Transaction Documents, and the maintenance of the Equipment and Gaming facility

The Parties warrant and represent to each other that nothing contained in this Section 5.3.1.2 or in any of the other Transaction Documents related to the rights provided under this Section is intended or shall be interpreted as constituting a contract for management services as contemplated by IGRA, 25 U.S.C. § 2711 (or any successor or related statute or regulation). The Parties acknowledge that in entering an order pursuant to this Section, the Court may not grant any Person any management authority or responsibilities with respect to the Facility and the Gaming Authority. The Parties expressly and explicitly acknowledge that in entering an order under this Section, the standard for granting the requested relief shall be if, in the opinion of the court, regardless of whether the New Boston Gaming Enterprise is wasting assets, Developer presents a prima facie case that an Event of Default has occurred and that the New Boston Gaming Enterprise is not depositing the Operating Profits with the depository in compliance with the terms and provisions of the Transaction Documents or properly maintaining the Equipment.

**Section 5.3.1.3:** *Election of Remedies.* Notwithstanding any term or provision of any of the Transaction Documents to the contrary, Developer may exercise any and all rights and remedies existing or available to Developer under any of the Transaction Documents or under applicable law, including, without limitation, the rights and remedies of a secured party with respect to the Operating Profits and Equipment under the Tribe's UCC provisions. In the event Developer shall elect to selectively and successively enforce its rights under applicable law or under any one or more of the Transaction Documents, such action shall not be deemed a waiver or discharge of any other right or remedy existing or available to Developer under any applicable law or under the Transaction Documents; nor shall such action discharge any lien, encumbrance or other security interest granted to Developer under the Transaction Documents.

**Section 5.3.2:** *Default by Developer.* Upon the occurrence of an Event of Default caused by Developer which remains uncured under the terms of Section 5.2 hereof, the Gaming Authority may, without notice or demand, terminate this Agreement and, as to Developer only, the other Transaction Documents to which it is a party and upon such termination, the Gaming Authority is relieved of any obligation to pay Development Fees accruing after the effective date of such termination.

**Section 5.3.3:** *Default by any Party.* The following provisions apply to any default under Section 5.3.1 and 5.3.2.

**Section 5.3.3.1:** *Costs of Default.* After the occurrence of an Event of Default, the Defaulting Party shall reimburse the Non-defaulting Party for all reasonable expenses the Non-defaulting Party incurs in connection with the enforcement of its rights and remedies hereunder or under applicable law, including without limitation attorneys' fees.

**Section 5.3.3.2:** *Cumulative Remedies.* The remedies provided for in

Exhibit 1

-18-

this Section 5.3 shall be cumulative to the extent permitted by applicable law, and may be exercised partially, concurrently or separately. The exercise of one or more remedies shall not be deemed to preclude the exercise of any other remedies.

## ARTICLE 6
## MISCELLANEOUS

**Section 6.1:** **Permitted Contests.** The Gaming Authority shall not be required to pay to any third party any tax, charge, assessment or imposition on any income with respect to the Facility, the Gaming Authority or the Equipment, so long as the Gaming Authority shall contest, in good faith and at its own cost and expense, the amount or validity thereof, in an appropriate manner or by appropriate proceedings which shall operate during the pendency thereof to prevent the collection of or other realization upon the tax, assessment, levy, fee, rent, charge, lien or encumbrance so contested and to further prevent the sale, forfeiture or loss of the Facility, Facility, Gaming Authority, or any part thereof, to satisfy the same. Each such contest shall be promptly prosecuted to final conclusion or settlement, and in any event the Gaming Authority will save Developer harmless against all losses, judgments, decrees and costs (including attorneys' fees and expenses in connection therewith) and will, promptly after the final determination of such contest or settlement, pay and discharge the amounts which shall be levied, assessed or imposed or determined to be payable therein, together with all penalties, fines, interest, costs and expenses thereon or in connection therewith. The Gaming Authority shall give Developer prompt written notice of any such contest. As used herein, "tax, charge, assessment or imposition on any income. . . on Gaming Authority . . . or on the Facility" shall not include, and shall not be construed to include, any obligation to Developer pursuant to this Agreement or any of the Transaction Documents or any required revenue sharing under the Tribal-State compact.

**Section 6.2:** **Confidentiality.**

**Section 6.2.1:** **Definition.** "Confidential Information" is defined as any information disclosed, whether orally, in writing, or electronically, to a Party, or any officer, director, employee, shareholder, affiliate, agent or attorney thereof, by or on behalf of another Party, or any officer, director, employee, shareholder, affiliate, agent or attorney thereof which relates in any way to the Parties, the Facility or the Project, or which is identified by the Disclosing Party at the time of disclosure as "confidential." As used in this Agreement, the term "Disclosing Party" shall be the Party to this Agreement which discloses or causes the disclosure of Confidential Information, and the term "Receiving Party" shall be the Party to this Agreement which receives Confidential Information, provided, however, that the Receiving Party and the Disclosing Party with respect to any Confidential Information may not be the same Party. Confidential Information may include, without limitation, (i) organizational documents of the Parties, or any member or affiliate thereof, (ii) any contracts, instruments, agreements or understandings which relates to the Gaming Authority, the Facility or the Facility, and (iii) any market studies or financial projections relating to the Project, regardless of the source of such study or projection. All Parties acknowledge that no Disclosing Party shall be deemed to make any representation or warranty as to the accuracy or completeness of any Confidential

Exhibit 1

-19-

Information provided to any Receiving Party or any other party and nothing herein shall be deemed to obligate any Party to disclose any Confidential Information to any other party, or to enter into any transaction with any other party.

**Section 6.2.2:** *Restrictions.* The Receiving Party shall hold all Confidential Information in strict confidence, shall prevent unauthorized disclosure of the Confidential Information to any third party, in whole or in part, and shall not use any Confidential Information for any purposes other than pursuing consummation of the transactions contemplated hereunder. The standard of care imposed on the Receiving Party for protecting Confidential Information will be reasonable and prudent care to prevent improper disclosure or use of Confidential Information, including, without limitation, by restricting access to the Confidential Information to only those employees or other persons who need access to it for purposes of the Receiving Party's evaluation and performance of the obligations the Receiving Party has assumed and agreed to perform hereunder and pursuant to any of the Transaction Documents, and by obligating such persons to comply with the restrictions provided in this Agreement. In the event of loss or theft of any documents, items of work in progress, or any work products embodying Confidential Information, the Receiving Party shall immediately notify the Disclosing Party.

**Section 6.2.3:** *Copying.* The Receiving Party shall not copy or reproduce Confidential Information in any form, without the written consent of the Disclosing Party, and shall keep accurate records of all copies or reproductions of Confidential Information made by the Receiving Party or persons on its behalf, which records shall be made available to the Disclosing Party upon request.

**Section 6.2.4:** *Permissible disclosures.* A Receiving Party shall not be subject to the obligations of this Agreement with respect to Confidential Information which: (i) is or becomes known publicly through no wrongful act of the Receiving Party or persons acting on its behalf; or (ii) was already known to the Receiving Party at the time of disclosure, as shown by the Receiving Party's written records; or (iii) is disclosed to the Receiving Party by a third party under no obligation of secrecy or confidentiality to the Disclosing Party and to whom the Disclosing Party disclosed the Confidential Information voluntarily; or (iv) is developed independently by an employee, agent or consultant of the Receiving Party with no knowledge of the Confidential Information disclosed by the Disclosing Party; or (v) is approved for release by written authorization of the Disclosing Party.

**Section 6.2.5:** *No license granted.* No right or license, whether expressed or implied, in the Confidential Information is granted to the Receiving Party other than to use the Confidential Information in the manner and to the extent authorized by this Agreement, for evaluation by the Receiving Party and performance of the obligations the Receiving Party has assumed and agreed to perform hereunder and pursuant to any of the Transaction Documents. The Receiving Party shall promptly return to the Disclosing Party upon request all Confidential Information and all copies thereof, and notes, extracts or derivative information related thereto, in whatever form of storage or retrieval. No information, release, public announcement, confirmation or denial concerning any potential transaction, the fact that discussions, negotiations or evaluations are taking place, or the terms, conditions or other facts with respect

Exhibit 1

thereto will be made by any Party without prior coordination with, and express approval of each of the other Parties.

**Section 6.3:** *Dispute Resolution: Governing Law and Limited Waiver of Sovereign Immunity.* **Section 6.3.1:** *Governing Law.* The Parties agree that any dispute arising out of or in connection with this Agreement of the other Transaction shall be resolved first pursuant to applicable federal law; second, pursuant to applicable State law; and third, pursuant to the applicable laws of the Tribe if no State or federal law applies. The parties designate the United States District Court for the Western District of Michigan as the forum for any litigation arising out of or relating to the Gaming Authority. Notwithstanding the foregoing, as any dispute to which the Uniform Commercial Code would apply, that Code, as adopted by the State, shall apply.

**Section 6.3.2:** *Scope of Waiver.* Subject to the provisions of Section 6.3, the Gaming Authority hereby expressly waives the jurisdiction of any courts of the Tribe and expressly provides a limited waiver of its sovereign immunity from suit and consents to suit in accordance with and pursuant to the terms and provisions of Section 6.3.1. Notwithstanding any term or provision of this Agreement or any of the other Transaction Document to the contrary, for purposes of this Section 6.3, the Gaming Authority's waiver of its sovereign immunity from suit pursuant to and in accordance with the terms and provisions hereof shall be deemed an express and explicit waiver of any sovereign immunity only of the Gaming Authority, and both the Gaming Authority and the Gaming Authority shall, upon request from Developer, execute and deliver such documentation as Developer shall reasonably request for the purposes of verifying the effectiveness of the Gaming Authority's waiver of its sovereign immunity pursuant to the terms and provisions hereof.

**Section 6.3.3:** *Procedural Requirements.* The Gaming Authority's waiver of its sovereign immunity as to unconsented suit is effective if, and only if, each and every one of the following conditions is met:

A.    The claim is made by a party designated under Section 6.3.5 hereof, and not by any other person, corporation, partnership or entity, whatsoever;

B.    The claim alleges a breach by the Gaming Authority of one or more specific obligations or duties assumed pursuant to the terms and provisions of this Agreement or the other Transaction Documents; and

C.    The claim seeks money damages for noncompliance with the terms and provisions of this Agreement or any of the other Transaction Documents, specific performance of this Agreement of any of the Transaction Documents, and/or injunctive relief related to the claimed noncompliance; provided, however, that the property, assets or funds specifically pledged and assigned to satisfy any judgment Developer secures against the Gaming Authority under this Agreement shall be limited to the Operating Profits and the Equipment.

Exhibit 1

**Section 6.3.4:** *Time Period.* The waiver granted herein shall commence on the Execution Date and shall continue for the longer of one (1) year following the termination of this Agreement pursuant to and in accordance with the terms and provisions hereof, or two (2) years after the claim accrues or is discovered upon the exercise of due diligence, except that the waiver shall remain effective for any proceedings then pending, and all appeals therefrom. Claims for non-payment of Development Fees due hereunder shall be deemed claims on an installment contract, and shall accrue for each such claim when each individual monthly payment is due; although a single assertion of non-payment of Development Fees shall be sufficient to commence an action for subsequent consecutive breaches.

**Section 6.3.5:** *Recipient of Waiver.* The recipients of the benefit of this waiver of sovereign immunity are limited to Developer, its successors and assigns, and any and all Persons covered by the indemnification provisions hereof; as to such latter persons, this waiver extends only to the enforcement of any rights to indemnification by the Gaming Authority, and to no other actions or persons.

**Section 6.3.6:** *Service of Process.* In any proceeding brought pursuant to this Agreement, the Gaming Authority consents to service made in accordance with the notice provisions of this Agreement or pursuant to the Federal Rules of Civil Procedure.

**Section 6.3.7:** *Enforcement.* The Gaming Authority expressly waives sovereign immunity from a judgment or order consistent with the terms and provisions of this Section 6.3, which is final because either the time for appeal thereof has expired or the judgment or an order is issued by a court having final appellate jurisdiction over the matter. The Gaming Authority waives its sovereign immunity in, and consents to the jurisdiction of, to be sued in and to accept and be bound by any order or judgment of the United States District Court for the Western District of Michigan, and any federal court having appellate jurisdiction thereover, consistent with the terms and provisions of this Section, without the necessary of exhaustion of Tribal remedies. Further, the Gaming Authority waives its sovereign immunity as to an action by Developer in the aforementioned courts seeking injunctive and/or declaratory relief against the Gaming Authority based upon an attempt by the Gaming Enterprise to revoke, limit, restrict or in any way amend its waiver of its sovereign immunity under this Agreement or the Transaction Documents, and as to enforcement in said courts of any such final judgment against the Gaming Authority, subject to the limitations in this Agreement. Without in any way limiting the generality of the foregoing, the Gaming Authority expressly authorizes any Governmental Authorities who have the right and duty under applicable law to take any action authorized or ordered by any court, to take such action as entering onto the Facility, or to enter into the Facility for the purpose of enforcing or giving effect to any judicial order or judgment entered against the Gaming Authority.

**Section 6.3.7.1:** *Assets Pledged to Satisfy Enforcement Proceedings.* The only assets of the Gaming Authority which shall be available, and which are thus specifically pledged and assigned hereby, to satisfy any enforcement proceedings or judgment in connection with this Agreement or the other Transaction Documents shall be limited to the Operating Profits and the Equipment

Exhibit 1

-22-

**Section 6.3.7.2:** *Limitation Upon Enforcement.* Except with respect to damages arising under the indemnification provisions of this Agreement awarded against the Gaming Authority, damages awarded against the Gaming Authority shall be satisfied solely from assets specified in Section 6.3.7.1 hereof, and shall not constitute a lien upon or be collectible from any other income or assets of the Kewadin Casinos Gaming Authority or the Tribe.

**Section 6.3.7.3:** *Expenses of Judicial Enforcement.* Except as ordered by a court of competent jurisdiction, the prevailing Party shall recover costs, including, without limitation reasonable attorneys' fees, incurred in connection with any judicial proceedings authorized under this Agreement. The Parties expressly agree that this provision shall survive the termination, for any reason, or expiration of this Agreement.

**Section 6.3.8:** *Guaranty of Gaming Authority.* The Gaming Authority agrees that it will not, and will prevent the Gaming Enterprise from revoking or limiting, in whole or in part, the Gaming Authority's limited waiver of sovereign immunity contained in this Section or in any way attempt to revoke or limit, in whole or in part, such limited waiver of sovereign immunity. In the event of any such revocation or attempted revocation, the Parties expressly recognize and agree that there remains no adequate remedy at law available to Developer, and the Gaming Authority hereby consents to and will not oppose the entry of appropriate injunctive relief, consistent with the terms and conditions of this Agreement, against the Gaming Authority which may be necessary to give effect to the waiver of sovereign immunity contained in this Section 6.3. In the event of any attempted limitation or revocation of the limited waiver of sovereign immunity granted herein, Developer may immediately seek judicial injunctive relief as provided in this Section without first complying with any of the prerequisites contained in this Section to the limited waiver of sovereign immunity granted herein. If requested by the Developer or its lender, the Gaming Authority agrees to execute a separate agreement encompassing this guaranty and the agreement not to interfere with the Gaming Authority's operation of the Project or fulfillment of its obligations hereunder and under the remaining Transaction Documents.

**Section 6.4:** *Counterparts.* This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but such counterparts shall together constitute one and the same instrument.

**Section 6.5:** *Not Joint Venturers.* Developer is not, and shall not by reason of any provision of any of the Transaction Documents or the Agreement be deemed to be, a joint venturer with or partner or agent of the Gaming Authority.

**Section 6.6:** *Indemnification.*

**Section 6.6.1:** *Indemnification by Gaming Authority.* The Gaming Authority agrees to indemnify and hold harmless the Gaming Authority and the Developer, its directors, officers, agents and employees, against any and all claims of or losses, damages or liability to third parties to which the Developer, its directors, officers, agents and employees, may become subject under any applicable law in connection with or arising out of the negligence or willful

Exhibit 1

misconduct of, the Gaming Authority, officers, agents and employees, and to reimburse the Developer, its directors, officers, agents and employees, for any out-of-pocket legal and other expenses (including reasonable attorneys' fees) incurred by the Developer, its directors, officers, agents and employees, in connection with investigating any such losses, claims, damages or liabilities or in connection with defending any actions relating thereto. Developer agrees, at the request and reasonable expense of the Gaming Authority, to cooperate in the making of any investigation in defense of any such claim and promptly to assert any or all of the rights and privileges and defenses which may be available to Developer. The Gaming Authority further releases and agrees to hold harmless Developer, its directors, officers, agents and employees, from any claims of or losses, damages or liability to third parties arising out of any covenant, representation or undertaking of the Gaming Authority contained in this Agreement or the other Transaction Documents. The provisions of this Section shall survive the termination of this Agreement and the other Transaction Documents.

**Section 6.6.2: _Indemnification by Developer._** Developer agrees to indemnify and hold harmless the Gaming Authority and its board members, officers, agents and employees, against any and all claims of or losses, damages or liability to third parties to which the Gaming Authority and its directors, officers, agents and employees, may become subject under any applicable law in connection with or arising out of the negligence or willful misconduct of the Developer, or its directors, officers, agents or employees, and to reimburse the Gaming Authority, and its board members, officers, agents and employees, for any out-of-pocket legal and other expenses (including reasonable attorneys' fees) they incurred in connection with investigating any such losses, claims, damages or liabilities or in connection with defending any actions relating thereto. The Gaming Authority agrees, at the request and reasonable expense of the Developer, to cooperate in the making of any investigation in defense of any such claim and promptly to assert any or all of the rights and privileges and defenses which may be available to the Gaming Authority. Developer further releases and agrees to hold harmless the Gaming Authority and its board members, officers, agents and employees, from any claims of or losses, damages or liability to third parties arising out of any covenant, representation or warranty of the Developer contained in this Agreement or the other Transaction Documents. The provisions of this Section shall survive the termination of this Agreement and the other Transaction Documents.

**Section 6.6.3: _Rights of Persons Covered._** The Persons covered by the indemnification provisions hereof shall be third party beneficiaries of this Agreement and shall have the right, subject to the provisions of this Agreement, to enforce such indemnification provisions.

**Section 6.6.3: _Governing Law._** The Parties agree that any dispute arising out of or in connection with this Agreement of the other Transaction shall be resolved first pursuant to applicable federal law; second, pursuant to applicable State law; and third, pursuant to the applicable laws of the Tribe if no State or federal law applies. Notwithstanding the foregoing, as any dispute to which the Uniform Commercial Code would apply, that Code, as adopted by the State, shall apply.

**Section 6.6.4: _Non-Tribal Taxes._** Any taxes, license fees or similar levies imposed upon

Exhibit 1

24

the Facility, the Facility, the Project, Gaming Enterprise or its Equipment, by any non-tribal Governmental Authority during the Term shall be paid as an Operating Expenses, provided, however, that nothing contained herein is intended or shall be construed as a prohibition on the Gaming Authority's right to contest the validity of any such tax, license fee or similar levy. Any taxes, license fees or similar levies imposed upon Developer by any non-tribal Governmental Authority, including, but not limited to, income, gross receipts, State business and occupation, sales, use or excise taxes, shall be borne by Developer.

**Section 6.6.5.1:** [Intentionally left blank.]

**Section 6.6.5.2:** _Licensing of Developer_. Developer may be required under applicable law to obtain tribal licenses with respect its rights and obligations hereunder. Upon satisfactory completion and approval by the Gaming Enterprise of background investigations as required by applicable law, the Gaming shall promptly issue to Developer any and all required licenses. The Gaming Enterprise shall not unreasonably withdraw or refuse to renew any license required under applicable law. Any tribal fees for licenses imposed on Developer or any Affiliate thereof shall not exceed the actual costs of background investigations and processing, including, without limitation, payments to third parties for services rendered in connection therewith.

**Section 6.6.5.3:** _Licensing of Facility and Employees of the Gaming Enterprise_. The Parties acknowledge and agree that under the IGRA and other applicable law, the Tribe, acting by and through the Tribal Gaming Commission, shall be required to license the Facility, the Gaming Enterprise and certain key employees and primary management officials of the Gaming Enterprise. The Parties warrant and represent to each other that the Tribe or the Tribal Gaming Commission shall impose upon the Gaming Enterprise an annual licensing fee reasonably calculated to permit the Tribal Gaming Commission to perform the regulatory and oversight functions of the Commission pursuant to and in accordance with the terms and provisions of the Tribal Gaming Ordinance, the IGRA and all other applicable laws.

**Section 6.7:** _Entire Agreement_. This Agreement and the other Transaction Documents represent the complete and entire agreement between the Parties with respect to the subject matter hereof and thereof and with respect to the design, development, financing and construction of the Facility. The Parties expressly and explicitly warrant and represent to each other that this Agreement and the other Transaction Documents are intended and shall supersede and replace any and all other contracts, agreements and instruments by and between them, or any Affiliate thereof relating to the subject matter hereof.

**Section 6.8:** _Notices_. Any notice to any party to this Agreement shall be in writing and shall be sent by certified U.S. Mail, postage prepaid and return receipt requested, by overnight delivery service, by facsimile, or by any other method, including electronic delivery, provided that in order to be effective the method must be reasonably anticipated to create a permanent written record of delivery. Notice will be deemed given as of the actual date of delivery as indicated on the record of delivery. Notice shall be given to:

If to Developer:

Exhibit 1

Jerry D. Campbell
9000 Page Avenue
Jackson, MI 49201

With copies to:

John A. Marxer, Esq.
P.O. Box 1377
Novi, MI 48376-1377

If to New Boston Gaming Enterprise:

KEWADIN CASINOS GAMING AUTHORITY
Attn: Chairman
523 Ashmun Street
Sault Ste. Marie, MI 49783

With copies to:

THE SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS
Attn: Chairperson/Board of Directors
523 Ashmun Street
Sault Ste. Marie, MI 49783

or to such other address(es) as the parties provide to each other in writing.

**Section 6.7:** *Amendments.* This Agreement may not be amended or modified, nor may any of its terms be modified or waived, except by written instruments signed by Parties.

**Section 6.8:** *Time of Essence.* Time is of the essence in the performance of this Agreement.

**Section 6.9:** *Binding Effect and Assignment.* This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, except that no Party may sell, transfer or assign its rights hereunder without the prior written consent of the other, which consent shall not be unreasonably withheld.

**Section 6.10:** *Waivers.* No waiver by a Party of any right, remedy or Event of Default hereunder shall operate as a waiver of any other right, remedy, or Event of Default or of the same right, remedy or Event of Default on a future occasion. No delay on the part of a Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude other or future exercise thereof or the exercise of any other right or remedy.

Exhibit 1

**Section 6.11:** _Assignment._ Jerry D. Campbell, personally, can assign the rights, privileges and obligations of this Agreement to another entity to which Jerry D. Campbell is a principal.

**Section 6.12:** _Force Majeure._ No party hereto shall be liable for the failure to perform its obligations hereunder if such failure is due to unforeseeable events beyond, the party's reasonable control and without such party's fault or negligence, including, but not limited to, acts of God, acts of the public enemy, acts of the other party, fires, flood, epidemics, quarantine restriction, strikes and embargoes, or shortages of materials and delays of contractors due to such causes, including any acts of the state or federal governments or their respective agencies or departments. Developer's obligations hereunder are subject to there not having occurred and continuing a material disruption of or material adverse change in financial, banking or capital market conditions that, in Developer's sole judgment, could materially impair the financing of the Facility. Said failure to perform shall be excused only for the period during which the event giving rise to said failure to perform exists.

_IN WITNESS WHEREOF_, the parties hereto have caused this Agreement to be duly executed by their authorized representatives and delivered as of the day and year first above written.

THE KEWADIN CASINOS GAMING AUTHORITY, an entity formed under the authority of THE SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS

By: _____  12/19/2011

Name: _____
Title: **Chairperson**

JLLJ CORPORATION

By: _____  12-19-10

Jerry D. Campbell

Its: Secretary/Treasurer

Exhibit 1

27

Exhibit A

**JLLJ Corporation**
**As of 12-6-2011**

<u>Exhibit A</u>

|  |  |
|---|---|
| Consulting* | 129,306.00 |
| General Legal | 77,500.00 |
| Expense Reports | 787.51 |
| Kewadin Reimbursement Payments | <u>647,500.00</u> |
| TOTAL | <u>855,093.51</u> |

(*) NOTE:
$120,000 paid for by Post It Stables Inc. prior to forming JLLJ.

Exhibit 1

**Exhibit B**
**PROMISSORY NOTE**

Sault Ste. Marie, Michigan
_____, 2011

$_____

For value received, THE KEWADIN CASINOS GAMING AUTHORITY, an entity formed under the authority of the SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS, a federally recognized Indian tribe (the "**Borrower**"), promises to pay to the order of JLLJ Corporation, a Michigan corporation (together with its successor and assigns, the "**Developer**"), at its office located at _____, or at such other place as the holder hereof may hereafter from time to time designate, in lawful money of the United States of America, the principal sum of _____ AND NO/100 DOLLARS ($_____), with interest on the unpaid principal balance of this Note outstanding from the date hereof until fully paid at the rate or rates of interest set forth below. The principal of this Note and all accrued and unpaid interest thereon shall be payable in full the sooner of the opening of the Temporary Facility for business or on _____, _____ (the "**Maturity Date**"). All payments under this Note shall be subject to the limitations on repayment referenced in Section 1.2.6 of the Amended and Restated Turn-key Facility Development Agreement.

Terms that are capitalized but not defined in this Note have the meanings given to such terms in the Amended and Restated Turn-Key Facility Development Agreement by and between the Borrower and the Developer.

The Development Agreement provides that the Developer will advance funds to the Gaming Authority, subject to condition precedent that, on or before the day of the first advance, the Developer has received documentation executed by the Tribe evidencing the terms of such loan. The purpose of the loan evidenced by this Note (the "**Loan**") is to finance costs until such time that the Temporary Facility is opened.

Interest shall accrue on the unpaid principal balance of this Note outstanding from time to time at the interest rate equal to the London Interbank Offered Rate ("LIBOR") quoted for 3-month transactions plus Four Hundred (400) basis points, with changes in such rate to be effected monthly on the first day of each month; provided that if an Event of Default (as defined below) shall exist hereunder, then, at the option of the Developer, during the entire period during which such Event of Default exists, interest shall be payable at a rate of interest equal to the lesser of: (i) the maximum lawful rate of interest permitted to be paid on this Note; or (ii) LIBOR plus Nine Hundred (900) basis points, whether or not payment of the Loan has been accelerated (the "**Default Rate**"). Interest shall at all times be calculated by multiplying the actual number of days elapsed in the period for which interest is being calculated and based on a 360-day year, including those periods of less than one full calendar month.

The principal balance of the Note and interest accruing thereon shall be accrue until the Maturity Date, at which time it shall be subsumed under and superseded by the Term Note. The entire remaining principal balance and all accrued but unpaid interest shall be due and payable on the Maturity Date or earlier upon demand following the occurrence of any Event of Default.

So long as an Event of Default does not exist, all payments of principal and interest on this Note shall be applied first to any costs of collection, then to late charges, then to interest and then to

Exhibit 1

the principal balance of the Note. If an Event of Default exists, the Developer may apply any payments received, to any sums due under this Note or any instrument securing this Note in such order and priority as the Developer, in its sole discretion, shall determine.

The Borrower may prepay the principal balance of the Note in whole or in part upon three day's advance written notice to the Developer without premium or penalty.

As security for the prompt and complete payment when due of the Loan, the Borrower does hereby pledge and grant to the Developer a continuing security interest in the gaming revenues derived from the Gaming Site and the equipment located on the Gaming Site (the "**Collateral**"). The Collateral shall be the sole source of repayment for the obligations hereunder.

The Borrower hereby expressly grants to the Developer, an irrevocable limited waiver of its sovereign immunity from suit with respect to any dispute, claim or controversy between the Developer and the Borrower arising out of or relating in any way to this Note or any actions contemplated to be taken in accordance herewith (collectively, a "**Claim**"). In furtherance of the foregoing waiver and with respect to any Claim, the Borrower hereby consents, with respect to any Claim, to be sued in (i) the United States District Court for the Western District of Michigan (and all federal courts to which decisions of the United States District Court for the Western District of Michigan may be appealed), (ii) any court of general jurisdiction in the State of Michigan (including all courts of the State of Michigan to which decisions of such courts may be appealed), and (iii) only if none of the foregoing courts shall have jurisdiction, or only to permit the enforcement of any judgment, decree or award of any foregoing court, all tribal courts and dispute resolution processes of the Borrower. The Borrower hereby expressly and irrevocably waives any application of the exhaustion of tribal remedies or abstention doctrine and any other law, rule, regulation or interpretation that might otherwise require, as a matter of law or comity, that resolution of a Claim be heard first in a tribal court or any other dispute resolution forum of the Borrower.

The Borrower represents and warrants to the Developer as of the date hereof that:

(a) The Borrower is a separate and distinct governmental instrumentality of a federally recognized Indian tribe.

(b) The execution, delivery and performance of this Note have been duly authorized by all requisite action of the governing body of the Borrower and will not violate, conflict with, or cause a default or any acceleration of performance under any provision of an applicable statute, law, rule, regulation, ordinance, judgment, order, writ, injunction, decree of any governmental authority (whether state, local, federal or tribal), or any provisions of any indenture, contract, agreement or other instrument to which the Borrower (or any affiliate of the Borrower, including but not limited to the Gaming Authority) is a party or by which it or any of its properties is bound. This Note constitutes a legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its respective terms.

(c) No consent, approval or authorization of, or registration, declaration or filing with, any governmental authority (whether state, local, federal or tribal) that has not been obtained is required on the part of the Borrower in connection with the execution and delivery of this Note, or the compliance with the terms, provisions

Exhibit 1

or conditions thereof, or, if so required, such consent, approval or authorization has been requested and obtained.

(d)  There are no actions, suits or proceedings pending, or to the knowledge of the Borrower, threatened that (i) affect or may affect the Borrower's ability to perform its obligations under this Note, or (ii) involve the membership or governance of the Borrower, or the validity or enforceability of this Note, except actions, suits and proceedings which, if adversely determined could not have a material adverse effect on the ability of the Borrower to make payments when due under this Note.

(e)  There has not been any submission or call for a vote of the membership of the Borrower on any ordinance, resolution or other matter pertaining to this Note that is contrary to or inconsistent with this Note.

(f)  The Borrower is not in violation of or subject to any contingent liability on account of the Tribe's Constitution and Bylaws or any statute, law, rule, regulation, ordinance, judgment, order, writ, injunction, decree, contract, agreement or instrument, that individually or in the aggregate could result have a material adverse effect on the ability of the Borrower to make payments when due under this Note.

(g)  The transaction evidenced by this Note does not violate any law pertaining to usury or the payment of interest on loans.

(h)  The Borrower is not insolvent (as such term is defined in Section 101(32) of the Bankruptcy Code of 1978, as amended) and will not be rendered insolvent (as such term is defined in Section 101(32) of the Bankruptcy Code of 1978, as amended) by execution of this Note, or the consummation of the transactions contemplated thereby.

(i)  All material representations of the Borrower contained in this Note are true and correct in all material respects.

(j)  All proceeds of this Note will be applied towards the project.

The occurrence of any of the following shall constitute an **"Event of Default"** under this Note:

(a)  The Borrower shall fail to pay any Note principal or interest when due.

(b)  The Borrower shall fail to perform any of Borrower's obligations contained in this Note.

(c)  The Borrower shall sell, transfer or convey all or substantially all of its interest in the Collateral, except with the prior written consent of the Developer.

(d)  The Borrower shall pledge, assign, encumber or create any security interest, consensual lien, hypothecation, transfer or divestiture, the effect of which is to grant another an interest (including an interest taken as security) in the Collateral or any portion of any thereof, either directly or indirectly.

Exhibit 1

(e)     The Borrower shall: (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property; (ii) admit in writing its inability, or be generally unable to pay its debts as they become due; (iii) make a general assignment for the benefit of creditors; (iv) commence a voluntary case under the federal bankruptcy laws (as now or hereafter in effect); (v) be adjudicated insolvent or be the subject of an order for relief under any chapter of the Bankruptcy Code (11 U.S.C. Section 101, et seq.); (vi) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts; or (vii) acquiesce in, or fail to controvert in a timely manner, any petition filed against it in an involuntary case under such bankruptcy laws.

(f)     A case or other proceeding shall be commenced, without the application or consent of the Borrower, in any court of competent jurisdiction, seeking the liquidation, reorganization, dissolution, winding up, or composition or readjustment of debts, of the Borrower, the appointment of a trustee, receiver, custodian, liquidator or the like of the Borrower or of all or any substantial part of its assets, or any similar action with respect to the Borrower under the federal bankruptcy laws (as now or hereafter in effect) or any other laws relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, and such case or proceeding shall continue undismissed, or unstayed and in effect, for a period of ninety (90) days, or an order for relief against the Borrower shall be entered in an involuntary case under such bankruptcy laws.

(g)     The Borrower shall fail to maintain its existence.

(h)     The Borrower shall enact any bankruptcy or similar law for the relief of debtors that would impair, limit, restrict, delay or otherwise adversely affect any of the rights and remedies of the Developer provided for in this Note, or the Borrower shall enact any statute, law, ordinance or rule that could have a material adverse effect upon the Borrower's financial condition or ability to repay the loan evidenced by this Note.

(i)     Any judgment(s) is entered for the payment of money in excess of $100,000 in the aggregate shall be entered against Borrower and any such judgment(s) shall remain unpaid, unbonded, or unstayed by appeal or otherwise for a period of 60 days from the date of entry.

(j)     Any representation herein shall be untrue in any material respect.

Upon and at any time after the occurrence of any Event of Default, the Developer, at the Developer's option, may declare all principal and interest outstanding hereunder to be immediately due and payable without presentment, demand, notice of nonperformance, notice of protest, protest or notice of dishonor, all of which are expressly waived by Borrower, and shall have all rights and remedies provided in this Note or in any other agreements between Borrower and Developer, and applicable law.

Exhibit 1

Borrower shall pay to the Developer immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by the Developer in connection with the enforcement of the Developer's rights and/or the collection of any amounts which become due to the Developer under this Note, and the prosecution or defense of any action in any way related to this Note, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Developer or any other person) relating to Borrower or any other person or entity.

This Note shall be construed in accordance with and governed by the internal laws of the State of Michigan and applicable federal law.

**THE BORROWER HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF, BASED ON OR PERTAINING TO THIS NOTE OR ANY OTHER RELATED DOCUMENT.**

Exhibit 1

THE KEWADIN CASINOS GAMING
AUTHORITY, an entity formed under the
authority of the SAULT STE. MARIE
TRIBE OF CHIPPEWA INDIANS


By: _____

    Name: _____

    Title:

Exhibit 1

**Exhibit C**
**TERM NOTE**

Sault Ste. Marie, Michigan

_____, 201_

$_____

For value received, THE KEWADIN CASINOS GAMING AUTHORITY, an entity formed under the authority of the SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS, a federally recognized Indian tribe (the "**Borrower**"), promises to pay to the order of JLLJ Corporation, a Michigan corporation (together with its successor and assigns, the "**Developer**"), at its office located at _____, or at such other place as the holder hereof may hereafter from time to time designate, in lawful money of the United States of America, the principal sum of _____ AND NO/100 DOLLARS ($_____), with interest on the unpaid principal balance of this Note outstanding from the date hereof until fully paid at the rate or rates of interest set forth below. The principal of this Note and all accrued and unpaid interest thereon shall be amortized over a seven year period from the date of issuance in equal monthly installments of principal, plus accrued interest, payable in full on the date which is seven years after the opening of the Temporary Casino (the "**Maturity Date**"). All payments under this Note shall be subject to the limitations on repayment referenced in Section 1.2.6 of the Amended and Restated Turn-key Facility Development Agreement.

Terms that are capitalized but not defined in this Note have the meanings given to such terms in the Amended and Restated Turn-Key Facility Development Agreement by and between the Borrower and the Developer.

Interest shall accrue on the unpaid principal balance of this Note outstanding from time to time at the interest rate equal to the London Interbank Offered Rate ("LIBOR") quoted for 3-month transactions plus Four Hundred (400) basis points, with changes in such rate to be effected monthly on the first day of each month; provided that if an Event of Default (as defined below) shall exist hereunder, then, at the option of the Developer, during the entire period during which such Event of Default exists, interest shall be payable at a rate of interest equal to the lesser of: (i) the maximum lawful rate of interest permitted to be paid on this Note; or (ii) LIBOR plus Nine Hundred (900) basis points, whether or not payment of the Loan has been accelerated (the "**Default Rate**"). Interest shall at all times be calculated by multiplying the actual number of days elapsed in the period for which interest is being calculated and based on a 360-day year, including those periods of less than one full calendar month.

So long as an Event of Default does not exist, all payments of principal and interest on this Note shall be applied first to any costs of collection, then to late charges, then to interest and then to the principal balance of the Note. If an Event of Default exists, the Developer may apply any payments received, to any sums due under this Note or any instrument securing this Note in such order and priority as the Developer, in its sole discretion, shall determine.

The Borrower may prepay the principal balance of the Note in whole or in part upon three day's advance written notice to the Developer without premium or penalty.

Exhibit 1

As security for the prompt and complete payment when due of the Loan, the Borrower does hereby pledge and grant to the Developer a continuing security interest in the gaming revenues derived from the Gaming Site and the equipment located on the Gaming Site (the "**Collateral**"). The Collateral shall be the sole source of repayment for the obligations hereunder.

The Borrower hereby expressly grants to the Developer, an irrevocable limited waiver of its sovereign immunity from suit with respect to any dispute, claim or controversy between the Developer and the Borrower arising out of or relating in any way to this Note or any actions contemplated to be taken in accordance herewith (collectively, a "**Claim**"). In furtherance of the foregoing waiver and with respect to any Claim, the Borrower hereby consents, with respect to any Claim, to be sued in (i) the United States District Court for the Western District of Michigan (and all federal courts to which decisions of the United States District Court for the Western District of Michigan may be appealed), (ii) any court of general jurisdiction in the State of Michigan (including all courts of the State of Michigan to which decisions of such courts may be appealed), and (iii) only if none of the foregoing courts shall have jurisdiction, or only to permit the enforcement of any judgment, decree or award of any foregoing court, all tribal courts and dispute resolution processes of the Borrower. The Borrower hereby expressly and irrevocably waives any application of the exhaustion of tribal remedies or abstention doctrine and any other law, rule, regulation or interpretation that might otherwise require, as a matter of law or comity, that resolution of a Claim be heard first in a tribal court or any other dispute resolution forum of the Borrower.

The Borrower represents and warrants to the Developer as of the date hereof that:

(a)   The Borrower is a separate and distinct governmental instrumentality of a federally recognized Indian tribe.

(b)   The execution, delivery and performance of this Note have been duly authorized by all requisite action of the governing body of the Borrower and will not violate, conflict with, or cause a default or any acceleration of performance under any provision of an applicable statute, law, rule, regulation, ordinance, judgment, order, writ, injunction, decree of any governmental authority (whether state, local, federal or tribal), or any provisions of any indenture, contract, agreement or other instrument to which the Borrower (or any affiliate of the Borrower, including but not limited to the Gaming Authority) is a party or by which it or any of its properties is bound. This Note constitutes a legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its respective terms.

(c)   No consent, approval or authorization of, or registration, declaration or filing with, any governmental authority (whether state, local, federal or tribal) that has not been obtained is required on the part of the Borrower in connection with the execution and delivery of this Note, or the compliance with the terms, provisions or conditions thereof, or, if so

Exhibit 1

required, such consent, approval or authorization has been requested and obtained.

(d)    There are no actions, suits or proceedings pending, or to the knowledge of the Borrower, threatened that (i) affect or may affect the Borrower's ability to perform its obligations under this Note, or (ii) involve the membership or governance of the Borrower, or the validity or enforceability of this Note, except actions, suits and proceedings which, if adversely determined could not have a material adverse effect on the ability of the Borrower to make payments when due under this Note.

(e)    There has not been any submission or call for a vote of the membership of the Borrower on any ordinance, resolution or other matter pertaining to this Note that is contrary to or inconsistent with this Note.

(f)    The Borrower is not in violation of or subject to any contingent liability on account of the Tribe's Constitution and Bylaws or any statute, law, rule, regulation, ordinance, judgment, order, writ, injunction, decree, contract, agreement or instrument, that individually or in the aggregate could result have a material adverse effect on the ability of the Borrower to make payments when due under this Note.

(g)    The transaction evidenced by this Note does not violate any law pertaining to usury or the payment of interest on loans.

(h)    The Borrower is not insolvent (as such term is defined in Section 101(32) of the Bankruptcy Code of 1978, as amended) and will not be rendered insolvent (as such term is defined in Section 101(32) of the Bankruptcy Code of 1978, as amended) by execution of this Note, or the consummation of the transactions contemplated thereby.

(i)    All material representations of the Borrower contained in this Note are true and correct in all material respects.

(j)    All proceeds of this Note will be applied towards the project.

The occurrence of any of the following shall constitute an **"Event of Default"** under this Note:

(k)    The Borrower shall fail to pay any Note principal or interest when due.

(l)    The Borrower shall fail to perform any of Borrower's obligations contained in this Note.

(m)    The Borrower shall sell, transfer or convey all or substantially all of its interest in the Collateral, except with the prior written consent of the Developer.

Exhibit 1

(n)     The Borrower shall pledge, assign, encumber or create any security interest, consensual lien, hypothecation, transfer or divestiture, the effect of which is to grant another an interest (including an interest taken as security) in the Collateral or any portion of any thereof, either directly or indirectly.

(o)     The Borrower shall: (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property; (ii) admit in writing its inability, or be generally unable to pay its debts as they become due; (iii) make a general assignment for the benefit of creditors; (iv) commence a voluntary case under the federal bankruptcy laws (as now or hereafter in effect); (v) be adjudicated insolvent or be the subject of an order for relief under any chapter of the Bankruptcy Code (11 U.S.C. Section 101, et seq.); (vi) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts; or (vii) acquiesce in, or fail to controvert in a timely manner, any petition filed against it in an involuntary case under such bankruptcy laws.

(p)     A case or other proceeding shall be commenced, without the application or consent of the Borrower, in any court of competent jurisdiction, seeking the liquidation, reorganization, dissolution, winding up, or composition or readjustment of debts, of the Borrower, the appointment of a trustee, receiver, custodian, liquidator or the like of the Borrower or of all or any substantial part of its assets, or any similar action with respect to the Borrower under the federal bankruptcy laws (as now or hereafter in effect) or any other laws relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, and such case or proceeding shall continue undismissed, or unstayed and in effect, for a period of ninety (90) days, or an order for relief against the Borrower shall be entered in an involuntary case under such bankruptcy laws.

(q)     The Borrower shall fail to maintain its existence.

(r)     The Borrower shall enact any bankruptcy or similar law for the relief of debtors that would impair, limit, restrict, delay or otherwise adversely affect any of the rights and remedies of the Developer provided for in this Note, or the Borrower shall enact any statute, law, ordinance or rule that could have a material adverse effect upon the Borrower's financial condition or ability to repay the loan evidenced by this Note.

(s)     Any judgment(s) is entered for the payment of money in excess of $100,000 in the aggregate shall be entered against Borrower and any such judgment(s) shall remain unpaid, unbonded, or unstayed by appeal or otherwise for a period of 60 days from the date of entry.

(t)     Any representation herein shall be untrue in any material respect.

Exhibit 1

Upon and at any time after the occurrence of any Event of Default, the Developer, at the Developer's option, may declare all principal and interest outstanding hereunder to be immediately due and payable without presentment, demand, notice of nonperformance, notice of protest, protest or notice of dishonor, all of which are expressly waived by Borrower, and shall have all rights and remedies provided in this Note or in any other agreements between Borrower and Developer, and applicable law.

Borrower shall pay to the Developer immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by the Developer in connection with the enforcement of the Developer's rights and/or the collection of any amounts which become due to the Developer under this Note, and the prosecution or defense of any action in any way related to this Note, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Developer or any other person) relating to Borrower or any other person or entity.

This Note shall be construed in accordance with and governed by the internal laws of the State of Michigan and applicable federal law.

**THE BORROWER HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF, BASED ON OR PERTAINING TO THIS NOTE OR ANY OTHER RELATED DOCUMENT.**

THE KEWADIN CASINOS GAMING AUTHORITY, an entity formed under the authority of the SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS

By: _____

    Name: _____

    Title:

Exhibit 1

Exhibit D                                    Calculation

I.   Section 1.2.6:  - Fixed Charge Coverage Ratio.  As of the Test Date, the Fixed Charge
Coverage Ratio was _____: 1.00

(i) Operating Profits for the Twelve Fiscal Month period ending on the Test Date,
$_____

minus (ii)   Non-Financed Capital Expenditures for the Twelve Fiscal              $_____
Month period ending on the Test Date

                                                                                  $_____
(a) = [(i)-(ii)]

Divided by (b) the sum of (in each case for the Twelve Fiscal Twelve
Month period then ending):

(i)  that portion of Cash Interest Expense with respect to                        $_____
Total Funded  Debt,

plus (ii)  payments of principal, with respect to long term Total Funded          $_____
Debt (including payment of amortization of the said loans),

Plus (iii) payments of principal, with respect to Pre-Development                 $_____
Funded Debt (including payment of amortization of the said loans),

Plus (iv) Payments of principal, with respect to Temporary                        $_____
Construction Debt (including payment of amortization of the said loans),

Plus (v) the portion of payment made under Capital Leases with
Respect to Total Funded Debt that should be treated as payment of
Principal in accordance with Generally Accepted Accounting Principles,            $_____

(b)= [(i) + (ii) + (iii) + (iv) + (v)]                                            $_____

equal Fixed Charge Coverage Ratio [a / b]                                         $_____

Exhibit 1

Exhibit E
Preliminary Temporary Construction and Development Budget

Temporary Facility Budget – Kewadin New Boston

| Description | Amount |
|---|---|
| Equipment | $691,671 |
| Currency | 762,650 |
| Slot Machines | * |
| Purchase of site | 300,000 |
| Temporary Facility | 2,423,732 |
| Legal and Consultant Expense | 200,000 |
| Contingency | 621,947 |
| Grand Total | $5,000,000 |

*Slot Machines will be provided
under a lease arrangement.

Exhibit 1

**Exhibit F**
Preliminary Facility Construction and Development Budget

Exhibit 1

## MEMORANDUM OF UNDERSTANDING REGARDING AMENDED AND RESTATED TURN-KEY FACILITY DEVELOPMENT AGREEMENT

This Memorandum of Understanding (the "MOU") is entered into by and between the **KEWADIN CASINOS GAMING AUTHORITY** ("Gaming Authority"), a duly authorized entity created under the laws of the **SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS** ("Tribe"), a federally-recognized Indian Tribe, with its offices located at 523 Ashmun Street, Sault Ste. Marie, MI 49783, and JLLJ Corporation, its successors and assigns, with offices located at 9000 Page Avenue, Jackson, MI 49201 (the "Developer") in order to affirm and clarify certain provisions of the Huron Township Amended and Restated Turn-Key Facility Development Agreement (the "Agreement") between the parties on December 19, 2011.

### RECITALS

A.       The Gaming Authority intends to develop, operate and maintain a licensed gaming establishment in Huron Charter Township, Michigan on Indian lands pursuant to and in accordance with the terms and provisions of the Indian Gaming Regulatory Act (IGRA).

B.       Pursuant to the terms of the Agreement, the Developer has agreed to assist the Gaming Authority with the development, financing, construction, and opening of the Facility.

C.       As is set forth in Recital H of the Agreement, it is the express intent of the Parties that the Gaming Authority "shall have the sole and exclusive authority to operate, manage and maintain the Facility, the Equipment and all gaming activities conducted by the Gaming Authority, and nothing [contained in the Agreement] is intended to be or shall be construed as constituting a contract for management services as contemplated by IGRA, 25 U.S.C. § 2711 (or any successor or related statute or regulation). The Parties acknowledge that neither Developer nor any affiliate thereof is to have any management authority or responsibilities with respect to the Facility, the Gaming Authority, the Equipment or any gaming activities conducted by the Gaming Authority. Further, the Parties acknowledge that neither Developer nor any affiliate thereof shall have any proprietary interest whatsoever in the Facility, Gaming Authority, the gaming activities conducted thereby, or have any right to possess, control or encumber the Facility, the Gaming Authority, or any gaming activities conducted thereby, or any of the equipment owned by the Gaming Authority and installed in the Project (the "Equipment") or leased by the Gaming Authority, except in the limited instance and scope of Developer exercising rights pursuant to a separate security agreement as a secured party in and to the Operating Profits generated by the Facility and in the Equipment pursuant to the Transaction Documents."

D.       The National Indian Gaming Commission (NIGC) has, nevertheless, recommended that the Gaming Authority and the Developer reiterate and clarify that intent with respect to several specific sections of the Agreement.

**NOW THEREFORE**, the Parties hereby reiterate and clarify their Agreement as follows:

Exhibit 1

1. **Section 1.2.3, Temporary Facility Expenses,** is intended to limit the role of the Developer to pre-opening development, improvements, and expenses; the Developer shall have no management authority or responsibility once the Facility opens.

2. **Section 2.5.6.3, Construction and Development Budget,** provides in its second paragraph, that the Developer shall supervise the progress of the design, development, construction, and opening of the Facility. This provision is intended to address only matters occurring prior to the opening of the facility; it does not diminish the right of the Authority to direct the Developer in the exercise of those supervisory responsibilities and, further, confers no management authority or responsibility on the Developer once the Facility opens.

3. **Section 2.5.6.3, Construction and Development Budget,** in its second paragraph, also provides that the Developer shall supervise the lease and installation of equipment within the facility. This provision is likewise intended to address only matters occurring prior to the opening of the facility; it does not diminish the right of the Authority to direct the Developer in the exercise of those supervisory responsibilities and, further, confers no management authority or responsibility on the Developer once the Facility opens.

4. **Section 1.2.4, Term Note,** provides that the Note shall be amortized over the initial term of the Agreement as set forth in Section 7.1. This section reference is incorrect as the result of a typographical error; the correct reference is to Section 3.1.

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed by their authorized representatives and delivered as of the day and year first above written.

THE KEWADIN CASINOS GAMING AUTHORITY, an entity formed under the authority of THE SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS

By: _____
Aaron Payment
Chairperson

JLLJ Corporation

By: _____
Jerry D. Campbell

Its: _____Secretary/Treasurer_____

Exhibit 1

2