Jeremy J. Patterson
Jeffrey R. Rasmussen
Frances Bassett
Robert T. Lawrence
Patterson Earnhart Real Bird & Wilson
1900 Plaza Drive
Louisville, CO  80027
Telephone: 303.926.5292
jpatterson@nativelawgroup.com
jrasmussen@nativelawgroup.com
fbassett@nativelawgroup.com
rlawrence@nativelawgroup.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF WESTERN MICHIGAN

Civil Action No. 2:22-cv-00027

KEWADIN CASINOS GAMING AUTHORITY,
a duly authorized entity created under the laws of
the Sault Ste. Marie Tribe of Chippewa Indians,

Plaintiff,

v.

HONORABLE JOYCE DRAGANCHUK,
District Judge, State of Michigan, Ingham County
Circuit Court, in her Individual and Official Capacities,
JLLJ DEVELOPMENT, LLC, a Michigan Limited
Liability Company, and LANSING FUTURE
DEVELOPMENT II, LLC, a Michigan Limited
Liability Company,

Defendants.

---

**BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

PAGE(S)

**CASES**

*ALLEN V. GOLD COUNTRY CASINO,*
   464 F.3D 1044 (9TH CIR. 2006) ....................................................................... 19
*ALVARADO V. TABLE MT. RANCHERIA,*
   509 F.3D 1008 (9TH CIR. 2007) ....................................................................... 20
*AM. INDIAN AGRIC. CREDIT CONSORTIUM V. STANDING ROCK SIOUX TRIBE,*
   780 F.2D 1374 (8TH CIR. 1985) ....................................................................... 21
*ARIZONA V. TOHONO O'ODHAM NATION,*
   818 F.3D 549 (9TH CIR. 2016) (DISMISSING ................................................. 20
*BATES ASSOC., LLC V. 132 ASSOC. LLC,*
   290 MICH. APP. 52 (MICH. APP. 2010) ............................................................ 19
*BEERS V. ARKANSAS,*
   (1857) ................................................................................................................ 23
*BLACK HILLS INST. OF GEOLOGICAL RESEARCH V. S.D. SCH. OF MINES AND,*
   12 F.3D 737 (8TH CIR. 1993) ........................................................................... 29
*BLOCK V. NORTH DAKOTA,*
   461 U.S. 273 (1983) ......................................................................................... 24
*C & L ENTER., INC. V. CITIZEN BAND POTAWATOMI TRIBE OF OKLAHOMA,*
   532 U.S. 411 (2001) ..................................................................................... 8, 22
*CALIFORNIA V. QUECHAN TRIBE OF INDIANS,*
   595 F.2D 1153 (9TH CIR. 1979) ....................................................................... 23
*CHEMEHUEVI INDIAN TRIBE V. CAL. STATE BD. OF EQUALIZATION,*
   757 F.2D 1047 (9TH CIR. 1985) ....................................................................... 21
*CTY. OF ONEIDA V. ONEIDA INDIAN NATION,*
   470 U.S. 226 (1985) ......................................................................................... 28
*EVERGLADES ECOLODGE AT BIG CYPRESS, LLC V. SEMINOLE TRIBE OF FLA.,*
   836 F. SUPP. 2D 1296 (S.D. FLA. 2011) .......................................................... 29
*EX PARTE YOUNG,*
   209 U.S. 123 (1908) ................................................................................... 17, 18
*FOSTER V. FOSTER,*
   505 MICH. 151 (2020) ....................................................................................... 25
*FRIENDS OF THE EARTH, INC. V. LAIDLAW ENVTL. SERVS., INC.,*
   528 U.S. 167 (2000) ......................................................................................... 16
*GAVLE V. LITTLE SIX, INC.,*
   555 N.W.2D 284 (MINN. 1996) ......................................................................... 20
*GILMORE V. O'SULLIVAN,*
   106 MICH. APP. 35 (MICH. APP. 1981) ............................................................ 27
*GREAT N. LIFE INS. CO. V. READ,*
   322 U.S. 47 (1944) ........................................................................................... 27
*HAGEN V. SISSETON WAHPETON COMM. COLL.,*
   205 F.3D 1040 (8TH CIR. 2000) ................................................................. 19, 21
*HARVEY V. UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,*
   416 P.3D 401 (UTAH 2017) .............................................................................. 31

*HURON POTAWATOMI, INC. V. STINGER,*
    227 MICH. APP. 127 (MICH. APP. 1997) ............................................................... 24
*IN RE GREEKTOWN HOLDINGS, LLC,*
    917 F.3D 451 (6TH CIR. 2019) .......................................................... 20, 21, 22, 24
*JOSEPH K. LUMSDEN BAHWETING PUB. SCH. ACAD. V. SAULT STE. MARIE TRIBE OF*
    *CHIPPEWA INDIANS,*
    2004 WL 2387619 (MICH. APP. 2004)..................................................................... 19
*KIOWA TRIBE OF OKLAHOMA V. MANUF. TECHS., INC.,*
    523 U.S. 751 (1988) ...................................................................................... 19, 20, 22
*KIOWA TRIBE V. HOOVER,*
    150 F.3D 1163 (10TH CIR. 1998) ..................................................................... 18, 21
*LESPERANCE V. SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS,*
    259 F. SUPP. 3D 713 (W.D. MICH. 2017)............................................................... 20
*LUJAN V. DEFS. OF WILDLIFE,*
    504 U.S. 555 (1992) ................................................................................................ 16
*MEMPHIS BIOFUELS LLC V. CHICKASAW NATIONS IND., INC.,*
    585 F.3D 917 (6TH CIR. 2009) ......................................................................... 19, 22
*MICHIGAN V. BAY MILLS INDIAN COMMUNITY,*
    572 U.S. 782 (2014) ........................................................................................PASSIM
*MITCHELL V. FORSYTH,*
    472 U.S. 511 (1985) ................................................................................................ 21
*MO. RIVER SERVICES, INC. V. OMAHA TRIBE OF NEBRASKA,*
    267 F.3D 848 (8TH CIR. 2001) ......................................................................... 23, 24
*MOE V. CONFEDERATED SALISH & KOOTENAI TRIBES OF THE FLATHEAD*
    *RESERVATION,*
    425 U.S. 463 (1976) ................................................................................................ 14
*MONTANA V. UNITED STATES,*
    450 U.S. 544, 101 S. CT. 1245, 67 L. ED. 2D 493 (1981) ..................................... 14
*NAMEKAGON DEV. CO. V. BOIS FORTE RESERVATION HOUS. AUTH.,*
    517 F.2D 508 (8TH CIR. 1979) ......................................................................... 23, 24
*ONEIDA V. ONEIDA,*
    414 U.S. 661 (1974) ................................................................................................ 15
*OTTAWA TRIBE OF OKLAHOMA. V. SPECK,*
    447 F. SUPP. 2D 835 (N.D. OHIO 2006) ................................................................ 18
*PENNHURST STATE SCH. & HOSP. V. HALDERMAN,*
    465 U.S. 89 (1984) .................................................................................................. 18
*PLAINS COMMERCE BANK V. LONG FAMILY LAND & CATTLE,*
    554 U.S. 316 (2008) .................................................................................................. 7
*POAFPYBITTY V. SKELLY OIL CO.,*
    390 U.S. 365 (1968) ................................................................................................ 15
*PRAIRIE BAND OF POTAWATOMI INDIANS V. PIERCE,*
    253 F.3D 1234 (10TH CIR. 2001) ........................................................... 14, 15, 16, 17
*PROCTOR GAMBLE CO. V. BANKERS TRUST CO.,*
    78 F.3D 219 (6TH CIR. 1996) ................................................................................ 12
*QUANTUM EXPLORATION, INC. V. CLARK,*
    780 F.2D 1457 (9TH CIR. 1986) ............................................................................ 28

*RAMEY CONSTR. CO., INC. V. APACHE TRIBE OF THE MESCALERO RESERVATION*,
  673 F.2D 315 (10TH CIR. 1982) ........................................................................... 21
*ROBBINS V. U.S. BUREAU OF LAND MGMT.*,
  438 F.3D 1074 (10TH CIR. 2006) ......................................................................... 20
*ROBERT A. HANSEN FAM. TR. V. FGH INDUS., LLC*,
  279 MICH. APP. 468 (2008) .................................................................................. 25
*RUPP V. OMAHA INDIAN TRIBE*,
  45 F.3D 1241 (8TH CIR. 1995) .............................................................................. 21
*SANTA CLARA PUEBLO V. MARTINEZ*,
  436 U.S. 49 (1978) ........................................................................... 8, 19, 22, 23
*SENECA-CAYUGA*,
  874 F.2D ................................................................................................................ 18
*SPURR V. POPE*,
  936 F.3D 448 (6TH CIR. 2019) ....................................................................PASSIM
*TAX COMM'N V. CITIZEN BAND POTAWATOMI TRIBE OF OKLAHOMA*,
  498 U.S. 505 (1991) ....................................................................................... 22, 24
*UNITED KEETOOWAH BAND OF CHEROKEE INDIANS V. OKLAHOMA*,
  927 F.2D 1170 (10TH CIR. 1991) ......................................................................... 16
*UNITED STATES V. KAGAMA*,
  118 U.S. 375 (1886) ............................................................................................... 5
*UTE DIST. CORP. V. UTE INDIAN TRIBE*,
  149 F.3D 1260 (10TH CIR. 1998) ......................................................................... 22
*UTE INDIAN TRIBE V. UTAH*,
  790 F.3D 1000 (2015) ..................................................................................PASSIM
*VANN V. KEMPTHORNE*,
  534 F.3D 741 (D.C. CIR. 2008) ............................................................................ 21
*VERIZON MARYLAND, INC. V. PUB. SER. COMM'N OF MD.*,
  535 U.S. 635 (2002) .............................................................................................. 18
*WARD V. CITY OF NORWALK*,
  640 F. APP'X 462 (6TH CIR. 2016) ...................................................................... 18
*WELLS FARGO BANK V. LAKE OF THE TORCHES ECON. DEV. CORP.*,
  658 F.3D 684 (7TH CIR. 2011) ............................................................................. 29
*WILLIAMS V. LEE*,
  358 U.S. 217 (1959) .............................................................................................. 31
*WINNEBAGO BUSINESS COMMITTEE V. KOBERSTEIN*,
  762 F.2D 613 (7TH CIR. 1985) ............................................................................. 29
*WINTER V. NATURAL RES. DEF. COUNCIL, INC.*,
  555 U.S. 7 (2008) ................................................................................................. 12
*WYANDOTTE NATION V. SEBELIUS*,
  443 F.3D 1247 (10TH CIR. 2006) ......................................................................... 18

## STATUTES

18 U.S.C. § 1151 ....................................................................................................... 7
25 U.S.C. § 177 ....................................................................................................... 15
25 U.S.C. §§ 1321-1326 .......................................................................................... 18

28 U.S.C. § 2201 ........................................................................................................ 13
28 U.S.C. §§ 1331, 1362 ............................................................................... 13, 15, 16
MICH. STAT. 691.1410 ............................................................................................. 27
U. S. CONSTITUTION, ART. VI ................................................................................. 18

**RULES**

MICH CT. R. 2.116(1) ................................................................................................ 21

**OTHER AUTHORITIES**

86 FED. REG. 7554 (JAN. 29, 2021) ........................................................................... 7
*ONEIDA NATION V. COUNTY OF ONEIDA: TRIBAL RIGHTS OF ACTION AND THE
    INDIAN TRADE AND INTERCOURSE ACT*,
    84 COLUM. L.REV. 1852 (1984)............................................................................ 5
*THE MECHANICS OF INDIAN GAMING MANAGEMENT CONTRACT APPROVAL*,
    , 8 GAMING L. REV. 333, 345 (2004).................................................................. 28

## INTRODUCTION

Because of the local ill feeling, the people of the States where [the Indians] are
found are often their deadliest enemies.

*United States v. Kagama*, 118 U.S. 375, 384 (1886).

State courts ... were generally hostile to tribal plaintiffs, for often the states
themselves were the primary violators of tribal land rights.

*Oneida Nation v. County of Oneida: Tribal Rights of Action and the Indian Trade and Intercourse*

*Act*, 84 Colum. L.Rev. 1852, 1858-1859 (1984).

Under the United States Constitution, the federal courts have the jurisdiction and the duty

to referee the line between state and tribal authority.  The federal system protects Indian tribes

from the exact thing which has been occurring in the Michigan State Court since soon after this

Court dismissed the Developers' prior federal court suit, JLLJ Development v. Kewadin Casinos

Gaming Authority, case 1:20-cv-00231.  Developers refiled their outlandish claims in the State

Court, and the State Court has issued order after order which violate the State's agreement, as part

of its decision to enter the Union, that it lacks jurisdiction over tribes, absent consent of the tribe,

and that it lacks jurisdiction over the federally owned tribal trust lands.

The State Court has done this while openly refusing to even rule on whether it has subject matter jurisdiction, and whether there is a waiver of sovereign immunity applicable to the facts of this case.

Kewadin now asks this Court to step in and issue a ruling that the State Court has refused to issue:  that the state court suit wrongfully encroaches on the Tribe's federally protected rights; and that this Court enjoin the State Court and other defendants from that ongoing violation of supreme federal law.

The current motion seeks a TRO and preliminary injunction because the State Court, while refusing to issue any order on subject matter jurisdiction, will soon rule on a motion through which the Developers seek default remedies on their claims for liens on federally owned tribal trust property and other claims.  Ex. 11, Order to Show Cause dated January 28, 2022.  That hearing, the next step in the Defendants' ongoing violation of federal law, is set for February 9, 2022.  This Court should enjoin the Defendants before then to preserve the status quo until this Court can reach the merits of this case.

Once the Court reviews the merits, it will see that it must permanently enjoin the Defendants' attempt to adjudicate a matter for which Kewadin did not consent to State Court jurisdiction.  As a part of Kewadin's conditional waiver of tribal sovereign immunity, the contract at issue contains a choice of forum provision: the sole forum was a federal court.  That is binding.  The contract also bars claims for monetary damages unless casinos were built on tribal trust lands in Indian Country, and even then, claims could only be brought against the assets from the tribal trust land casinos.  That prerequisite is also a limitation on the waiver of the Tribe's sovereign immunity.  The casinos in Indian Country were never built, so there are no assets and therefore no claim for monetary damages for which tribal sovereign immunity has been waived.

6

In the contract, Kewadin chose not to agree to State Court jurisdiction and the Developers accepted that limitation.  The State Court proceedings are an illustration of why Kewadin chose not to agree to State Court jurisdiction.  This Court should enjoin the State Court proceeding.

### DISCUSSION OF FACTS AND PROCEDURAL HISTORY

Kewadin is a department of, and wholly owned by, the Sault St. Marie Tribe of Chippewa Indians (the Tribe), and the Tribe is a federally recognized Indian Tribe.  86 Fed. Reg. 7554 (Jan. 29, 2021).  As is undisputed, the Tribe's sovereign immunity applies to Kewadin.  In 2011 Kewadin entered into contracts with Developer JLLJ (Compl. Ex. 1) and with Developer Lansing Future (Compl. Ex 2.)[1]  In those contracts, the Developers acknowledged that they were taking substantial financial risk.  They would invest money, but they would *only* be repaid if the Tribe was able to obtain necessary federal approval and other permits and authorizations necessary to build casinos on tribal trust lands within the Sault Ste. Marie Tribe's "Indian Country" in locations in the Detroit (JLLJ) and Lansing (Lansing Future) metro areas.[2]

This express, unequivocal, and mutually agreed upon contractual limitation was included in the contracts' very narrow and conditional waivers of sovereign immunity and choice of forum provisions.  The Developers agreed that the conditions upon Kewadin's consent to jurisdiction included: 1) Kewadin limited its consent *solely* to suits in the United States District Court for the District of Michigan; and 2) Kewadin's consent to claims for monetary damages only applied to profits from a casino on trust lands within the Tribe's Indian Country.  Contracts §6.3.2.

---

[1] The contracts, attached hereto as Exhibits 1 and 2, are, in all aspects material to this case, substantively identical and the paragraph numbering is identical.

[2] A tribe's Indian Country is defined by 18 U.S.C. § 11151.  It includes a tribe's reservation lands and other lands owned by the United States in trust for a tribe.  A Tribe has plenary jurisdiction over trust lands in its Indian Country.  *Plains Commerce Bank v. Long Family Land & Cattle*, 554 U.S. 316, 335 (2008).

Therefore, Kewadin's state court motion to dismiss presented as easy a case for dismissal as one is likely to see.  The Michigan state courts lack jurisdiction over Kewadin unless Kewadin affirmatively chooses to consent to jurisdiction in a state court.  Any claimed consent must be strictly construed against state court jurisdiction: all ambiguities must be read in favor of Kewadin. *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 790 (2014) (quoting *C & L Enter., Inc. v. Citizen Band Potawatomi Tribe of Oklahoma*, 532 U.S. 411, 418 (2001)) (hereinafter *Bay Mills*); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978).  Here, the contract expressly states there is no consent.

Similarly, the Developers expressly agreed that they could only bring monetary claims if the hoped-for casinos were built, and then solely against the profits from those casinos.  The Developers allege that they provided under $9,000,000, and that they expected a payday of approximately $124,000,000 if their risky investment worked as hoped.  Compl. ¶9.  But if the casinos never generated operating profits, then both the Developers and the Tribe/Kewadin would lose their investments.  Exs. 1& 2 §§1.2; 4.3; 6.3.

The casinos were never built.  But the Developers audaciously brought suit seeking the payday that they would have obtained if the casinos had been built and been as profitable as hoped.  They first brought suit in the federal court (for which there was a limited waiver of immunity).  That suit was dismissed.  They then sued in the State Court even though the parties chose not to agree to any state court forum.

Kewadin moved to dismiss the Developers' state court suit.  That motion made the obvious and correct arguments that the State Court lacked subject matter jurisdiction because the contract's immunity waiver provisions expressly limited the choice of forum to a federal court, and that the Tribe had not consented to any off-contract claim and had only consented to on-contract claims

(in the federal court) if the prerequisite condition was met—that is, if the casinos had been built on tribal trust lands within the Tribe's Indian Country.

Although Kewadin has repeatedly moved to dismiss the State Court suit for lack of subject matter jurisdiction, the State Court has repeatedly, and with increasing vitriol, refused to decide whether or not it has subject matter jurisdiction.  Similarly, the State Court has refused to rule on whether  there is a waiver of the Tribe's sovereign immunity from suit.

In response to Kewadin's first motion to dismiss, the Developers made a conclusory and paradoxical assertion that Kewadin's motion to dismiss for want of jurisdiction did not seek to dismiss for want of jurisdiction.  In its subsequent oral statement of its ruling, the State Court expressly stated it was denying the motion to dismiss *without ruling one way or the other on whether it had subject matter jurisdiction.*  App 6 at 20-21.  Its sole stated basis for expressly refusing to rule on whether it had jurisdiction was a repetition of the Developers' unexplained assertion that the motion to dismiss for want of jurisdiction somehow did not seek dismissal for want of jurisdiction.  *Id.*

In objections to a proposed order, dated July 1, 2021, Kewadin again asserted that the State Court was required to rule, one way or the other, on whether or not it had jurisdiction.  The Court again refused.

Because the State Court had expressly refused to rule on jurisdiction based upon an alleged procedural issue, Kewadin filed a second motion to dismiss which cured that supposed flaw.  The motion noted that lack of subject matter jurisdiction can be raised at any time, and that when raised the State Court must decide it as a threshold issue.

Without explanation, the State Court issued an order denying the second motion to dismiss, based upon its repetition of the Developers' false statement that the second motion to dismiss,

seeking to decide issues that were not decided in the first motion, was a motion to reconsider on the first motion to dismiss.

*Taken together, the State Court's orders to that point expressly refused to rule on whether or not the State Court had <u>subject matter jurisdiction</u>, and expressly refused to rule on any issue other than under the standard for a motion to dismiss for failure to state a claim.*

While Kewadin was seeking to force the State Court to issue a ruling on these threshold issues, the Developers improperly sought to proceed with extremely broad discovery, and then brought a motion to compel discovery. In their motion, the Developers asserted that they had the right to very broad discovery from both Kewadin and the Tribe.[3] Kewadin further argued that it had provided all non-privileged information, and that the Developers would need to agree to a standard confidentiality order before it could receive many of the documents. Kewadin also noted that many of the discovery requests were directed to the Tribe, which is not a party to this suit, and that the Developers had previously stipulated that the State court lacked jurisdiction over the Tribe.[4] Kewadin further discussed that the Developers were seeking to compel the Tribe and Kewadin to take actions on trust lands in the Tribe's Indian Country in violation of tribal law.

The Developers asserted that the State Court should overrule the Tribe's objection to discovery based on two frivolous grounds. First, they asserted the Court should overrule the

---

[3] As one of numerous examples, the Developers sought nearly all of the *Tribe* and Kewadin's financial records, including every financial statement, tax return, profit and loss statement, auditor's report, financial document sent to any other government, and other financial record, for the past 12 years. This included records of other Kewadin casinos located in the Upper Peninsula. Second Request for Production 1, 2. The Developers sought those documents without even agreeing to a confidentiality order. The Developers also included an improper and vague catch-all request for "all documents … involving the subject matter of this litigation." First Request for Production 3.

[4] For example, the Developers sought all Tribal financial documents, and documents from the Tribe's Board of Directors. First Request for Production 2, Second Request for Production 2, First Interrogatory 3.

Tribe's objection because the Developers' attorney believed that some individuals were officers of both the Tribe and Kewadin.  Second the Developers' attorney asserted that the Tribe had waived its immunity because, in some unspecified filing,[5] Kewadin's attorney had referred to Kewadin as the Tribe.  The Developers also argued the State Court should impose sanctions against Kewadin for its reliance upon its argument that the Court was required to decide subject matter jurisdiction as a threshold question before the Court issued orders compelling discovery on merits issues.

In response to that motion to compel, Kewadin asserted that the State Court could not compel discovery until it first determined whether it had jurisdiction, and until it first determined, on the facts, whether there was a waiver of the Tribes' sovereign immunity from suit.  The only result from that argument was that the State Court angrily and abruptly prevented Kewadin from even completing its argument on the motion, with the Court stating that Kewadin's continued attempt to obtain a ruling on the threshold question of jurisdiction was "just simply outrageous." Ex. 7 at 16, Transcript of hearing on discovery.  The Court overruled the Tribe's objection to discovery, merely repeating the Developers' attorney's unsupported allegation of fact as its basis. The Court then asked the Developers how much money they wanted in sanctions, did not ask for any proof in support of that, and did not even allow Kewadin to respond to the claimed amount. It granted the motion to compel and imposed the amount of attorney fees which the Developers requested.  It then abruptly ended the hearing while Kewadin was in mid-sentence attempting to create a factual record of its objections to the court's order.  Exhibit 10, Order, October 27, 2021.

---

[5] Developers' assertion is frivolous as a matter of law.  There is obviously no case from any jurisdiction which holds that a misreference in a brief constitutes a clear and unequivocal waiver of a non-party's immunity.  But Kewadin also notes that it has reviewed its briefs on the motions to dismiss and cannot locate any instance which supported Developers' attorneys' allegation of fact.

Kewadin sought to appeal from the order on discovery, contending that because it overruled objections based upon lack of jurisdiction and the previously unresolved immunity issues, it was, sub silento, a denial of the remaining portions of the prior motions to dismiss on those grounds.  The Michigan Court of Appeals disagreed, and therefore dismissed the appeal.

After the order compelling Kewadin and the Tribe to provide vast discovery was issued, the Developers filed a motion seeking to hold Kewadin in contempt.  Contrary to State law, the State Court immediately set that motion for hearing.  Ultimately the State Court had to deny that motion because of multiple flaws in the motion.  The Developers have now refiled that motion, and the State Court again immediately set the refiled motion for expedited review on February 9, 2022.  Exhibit 11, Order to Show Cause dated January 28, 2022.

In their refiled motion to compel, the Developers assert that if the Tribe does not provide the ordered discovery, or if Kewadin does not provide the ordered discovery (including confidential attorney client documents, work product, and other documents protected by tribal confidentiality law and other laws) then the State Court should order default on liability—without *ever* deciding whether it has subject matter jurisdiction in the first instance and without ever deciding how it could order liability on monetary claims when the condition precedent to jurisdiction over those claims has not been met.

### DISCUSSION OF LAW

To obtain a temporary restraining order or an injunction Kewadin must show that: 1) it is "likely to succeed on the merits," 2) it is "likely to suffer irreparable harm in the absence of preliminary relief," 3) "the balance of equities tips in his favor," and 4) "an injunction is in the public interest." W*inter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); *Proctor Gamble Co. v. Bankers Trust Co*. 78 F.3d 219 227 (6th Cir. 1996) (holding that the same four

factor test applies to a TRO, but with more emphasis on the need to preserve the status quo so that a reasoned resolution of the dispute can be had).

Here, all four factors strongly favor the issuance of injunctive relief.

## I.   KEWADIN IS LIKELY TO PREVAIL ON THE MERITS

### A.   KEWADIN WILL BE ABLE TO DEFEAT ANY DEFENSES THAT ANY DEFENDANT MIGHT RAISE.

#### 1.   This Court has jurisdiction.

Kewadin is an independent body within the Sault St. Marie Tribe's government.  The Tribe maintains government-to-government relations with the United States and has a governing body that is duly recognized by the Secretary of the U.S. Department of the Interior.  Plaintiff asserts claims arising under the Constitution and laws of the United States.  The allegations of the Complaint give rise to an actual controversy within the meaning of 28 U.S.C. § 2201.

District courts have "original jurisdiction of all civil actions" and "all civil actions, brought by any Indian Tribe" that arise "under the Constitution, laws, or treaties of the United States."  28 U.S.C. §§ 1331, 1362.

Here, this issue is limited to the context of a State Court unlawfully asserting state adjudicatory jurisdiction over an Indian tribe.  When the State of Michigan signed onto the United States Constitution, it agreed to a constitutional scheme in which the State disclaimed sovereign power over Indian tribes.  Const. Art. VI, ¶2 (supremacy clause); Art I, §8, Clause 3 (Indian Commerce clause).  Under that scheme, a federal court has the jurisdiction and the duty to determine if a State is exceeding federally imposed limitations on state court authority over Indian

tribes.[6]  It is not, as Defendants appear to believe, that state courts can violate federal law and then complete their conquest of the sovereign Tribe by using state-imposed fines and threats.

For example, in *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463 (1976), the United States Supreme Court unanimously affirmed a district court injunction issued in favor of a tribe and against a state.  It held that the Tribe's claim of injury to its right of self-government:

> "confer[s] standing upon it apart from the monetary injury asserted by the individual Indian plaintiffs.  Since the substantive interest which Congress has sought to protect is tribal self-government, such a conclusion is quite consistent with other doctrines of standing.

*Id.* at 469.

This specific issue has not been litigated in the Sixth Circuit, where the only reservations are in Michigan, but this specific question has been repeatedly litigated in the United States Court of Appeals for the Tenth Circuit, a federal circuit that is encompasses several states in which state courts have historically sought to improperly exercise state adjudicatory jurisdiction over Indian tribes.  For example, in *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1241 (10th Cir. 2001), the Prairie Band of Potawatomi and State of Kansas disagreed over the Band's authority to issue registrations and titles for motor vehicles.  The Band presented that disagreement to the federal court through a complaint for declaratory and injunctive relief after the State cited tribal members in Kansas state courts for alleged off-Reservation violations of the State's motor vehicle registration laws.  The District Court issued a preliminary injunction and the State appealed from that preliminary injunction, asserting, inter alia, that the Band had not suffered any injury through

---

[6] It has the reciprocal power to determine if a Tribe is exceeding federally imposed limitations on tribal authority.  *E.g., Montana v. United States*, 450 U.S. 544, 564, 101 S. Ct. 1245, 1258, 67 L. Ed. 2d 493 (1981).

the State's refusal to grant recognition to the tribally issued registrations and titles.  The Court of

Appeals held:

> The state's refusal to extend recognition, therefore, causes an obvious harm to the tribe: interference with or infringement on tribal self-government.  . . . Protection of that right is the foundation of federal Indian law; accordingly, we conclude that the tribe has standing.

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1242 (10th Cir. 2001).

Federal case law also establishes that federal question jurisdiction exists under both § 1331

and § 1362 for Indian tribes who sue in federal court to protect, enforce, or vindicate their property

rights:

> [T]he assertion of a federal controversy …. rests on the not insubstantial claim that federal law now protects, and has continuously protected from the time of the formation of the United States, possessory rights to tribal lands, wholly apart from the application of state law principles which normally and separately protect a valid right of possession.  . . .  Finally, the complaint asserts a claim under the Nonintercourse Acts which put in statutory form what was or came to be the accepted rule—that the extinguishment of Indian title required the consent of the United States.  To us, it is sufficiently clear that the controversy stated in the complaint arises under the federal law within the meaning of the jurisdictional statutes and our decided cases.

*Cty. of Oneida v. Oneida Indian Nation*, 414 U.S. 661, 677-78 (1974) (hereinafter "*Oneida I*");

*see also Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 372 (1968).

The above holding is based upon the Non-Intercourse Acts, 25 U.S.C.  §  177,  which

provides:

> No purchase, grant, lease, or other conveyance of lands, *or of any title or claim thereto,* from any Indian nation or tribe of Indians, shall be of any validity *in law or equity*, unless the same be made by treaty or convention entered into pursuant to the Constitution.  (emphasis added).

This Court has jurisdiction under these cases because the Developers are expressly asking

the State Court to impose a lien on federally owned trust lands of the Tribe, Ex. 4, Counts, VII,

VII, and X,  Moreover, the State Court is proceeding with that claim and currently has before it a

motion which would result in a default judgment against Kewadin, even though the State Court has never even discussed how it could possibly have jurisdiction to issue that remedy against federally owned lands.  This by itself gives this Court jurisdiction over this case.[7]

Additionally, a federal court has jurisdiction under § 1331 and § 1362 for "a tribe asserting its immunity from the enforcement of state laws." *United Keetoowah Band of Cherokee Indians v. Oklahoma*, 927 F.2d 1170, 1173 (10th Cir. 1991); *see also Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1239-41 (10th Cir. 2001) (Tribe's complaint raised a colorable federal claim).  Kewadin's complaint states a claim for that exact relief, and this Court has jurisdiction, and ultimately the duty, to grant that relief.  Federal question jurisdiction therefore exists here under § 1331 and § 1362.

### 2.       Kewadin has standing to bring this suit.

To establish standing,

> a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 180-81 (2000).  These requirements are often described in short form as injury, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Kewadin easily meets these requirements for standing.

---

[7] In fact, Defendants' assertion (contrary to its prior statements to the National Indian Gaming Commission) that the contract provides these rights does more than just give this Court jurisdiction.  It will ultimately require this Court to hold that the alleged contract itself is <u>void *ab initio*</u>.  *See §I.B.4, infra.*

As discussed above, Defendants' violation of Kewadin and the Tribe's federally protected rights of jurisdiction, immunity, federal protection of federally owned trust lands, and freedom from state encroachment are injuries.  In fact, they are irreparable injuries, *e.g. Ute Indian Tribe v. Utah*, 790 F.3d 1000, 1006 (2015) (then-Circuit Judge Neil Gorsuch, citing *Prairie Band*, 253 F.3d at 1250-51.  As discussed above, federal courts have repeatedly issued injunctions based upon federal supremacy in Indian affairs.  Additionally, even though the Defendant Judge has refused to rule on whether the State Court has subject matter jurisdiction, she ordered Kewadin and the Tribe to take action on the Tribe's Reservation in violation of the Tribe's own laws.  This includes her order that the Tribe must, in violation of tribal law, take action on the Reservation to gather nearly all of its financial documents and release them to the Defendant Developers.  Defendants further assert that the State Court can impose financial sanctions against Kewadin and that the State Court can then order default on liability against Kewadin, without having first determined whether the Circuit Court has jurisdiction over Plaintiffs' claims.

All of those injuries will be resolved by a decision in favor of Kewadin in this suit under any of these arguments.  Kewadin therefore has standing.

> **3.    The Tribal Plaintiffs' claims against the State Judge are not barred by Eleventh Amendment immunity.**

In this matter, Kewadin is solely seeking declaratory prospective relief.  Eleventh Amendment immunity therefore does not apply.  In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court concluded that when a state agrees to join the United States and thus agrees the federal constitution is the supreme law, the State also agrees to federal court jurisdiction against its officers who are violating federal law and that Eleventh Amendment immunity therefore does not apply to the claim.  The *Ex Parte Young* doctrine provides a federal court forum "to vindicate

federal rights and hold state officials responsible to the supreme authority of the United States." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984).

In determining whether a suit falls within the *Ex Parte Young* exception, the Court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Ser. Comm'n of Md.*, 535 U.S. 635, 645 (2002). A prayer for injunctive relief asking that a state official be restrained from acting in contravention of controlling federal law satisfies *Verizon's* straightforward inquiry. *Id*.

Courts have repeatedly held that a state court judge who violates a tribe's federally protected rights is subject to suit under *Ex Parte Young*. *Ottawa Tribe of Oklahoma. v. Speck*, 447 F. Supp. 2d 835, 840 (N.D. Ohio 2006) (*Ex Parte Young* did not bar Tribe's suit seeking to enforce its federally protected hunting and fishing rights); *Wyandotte Nation v. Sebelius*, 443 F.3d 1247 (10th Cir. 2006) (enjoining a Kansas state judge); *Kiowa Tribe v. Hoover*, 150 F.3d 1163, 1171-72 (10th Cir. 1998) (enjoining two Oklahoma state judges); and *Seneca-Cayuga*, 874 F.2d at 716-17 (enjoining defendants, including two Oklahoma state judges). *See also Ward v. City of Norwalk*, 640 F. App'x 462, 467–68 (6th Cir. 2016) (an action for prospective relief against a state court judge "falls squarely within the *Ex parte Young* doctrine.").

The Tribal Plaintiffs' complaint satisfies this test. The Tribal Plaintiffs allege the prosecution of the State Court suit violates federal laws discussed above – including but not limited to the Supremacy Clause of the U. S. Constitution, art. VI, § 2, the Indian Commerce Clause, and the non-Intercourse Act, and 25 U.S.C. §§ 1321-1326 (which prescribes the exclusive means by which the State of Michigan may exercise criminal and/or civil jurisdiction over

18

Reservation lands).  Accordingly, the *Ex Parte Young* exception applies to the Tribe's request for

an injunction against Judge Draganchuk, acting in her official capacity.

    **B.**    **KEWADIN HAS AN UNASSAILABLE CLAIM ON THE MERITS.**

       **1.**    **Kewadin has sovereign immunity from unconsented suit.**

    Indian Tribes are "separate sovereigns pre-existing the Constitution," *Bay Mills*, 571 U.S.

at, 788 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)).  Because of that,

they have "the common law immunity from suit traditionally enjoyed by sovereign powers."  *Bay*

*Mills*, 571 U.S. at 788 (quoting *Santa Clara Pueblo*, 436 U.S. at 58).

    A tribe's sovereign immunity is a matter of federal law.  *Bay Mills*, 571 U.S. at 788-89;

*Kiowa Tribe of Oklahoma v. Manuf. Techs., Inc.*, 523 U.S. 751, 754 (1988) ("tribal immunity is a

matter of federal law") (hereinafter *Kiowa Tribe*); *Santa Clara Pueblo*, 436 U.S. 49; *Spurr v. Pope*,

936 F.3d 448, 482-83 (6th Cir. 2019); *Memphis Biofuels LLC v. Chickasaw Nations Ind., Inc.*, 585

F.3d 917, 921 (6th Cir. 2009); *Joseph K. Lumsden Bahweting Pub. Sch. Acad. v. Sault Ste. Marie*

*Tribe of Chippewa Indians*, 2004 WL 2387619 (Mich. App. 2004) (hereinafter *Bahweting PSA*).

    Because it is an arm of the Sault Ste. Marie Tribe, Kewadin has sovereign immunity from

suit.  A tribe's federally protected sovereign immunity extends to its departments, corporations,

and other wholly owned arms of the tribe and applies regardless of whether the claims arise on or

off of the tribe's Reservation.  *E.g., Bay Mills,* 571 U.S. 782 (State suit seeking to enjoin a tribe's

off-reservation casino is barred by the Tribe's sovereign immunity from suit); *Kiowa Tribe,* 523

U.S. at 760 (*"*Tribes enjoy immunity from suits on contracts, whether those contracts involve

governmental or commercial activities and whether they were made on or off a reservation"); *Bates*

*Assoc., LLC v. 132 Assoc. LLC*, 290 Mich. App. 52 (Mich. App. 2010) (citing with approval the

above holding from *Kiowa Tribe*); *Hagen v. Sisseton Wahpeton Comm. Coll.,* 205 F.3d 1040, 1043

(8th Cir. 2000) (tribally owned college has sovereign immunity); *Allen v. Gold Country Casino,*

19

464 F.3d 1044 (9th Cir. 2006) (tribally owned casino had sovereign immunity from unconsented suit); *Gavle v. Little Six, Inc.*, 555 N.W.2d 284 (Minn. 1996) (tribal gaming corporation had sovereign immunity); *Cohen's Handbook of Indian Law* § 21.02[2] at 1327 (2012 ed.) ("Tribal sovereign immunity extends to off-reservation activities of the tribe and applies to both governmental and commercial activities.") (emphasis added)).

In *Bay Mills*, the State of Michigan recently asked the United States Supreme Court to overturn precedent and limit tribal sovereign immunity to on-reservation, non-commercial activity. The Supreme Court rejected that invitation, holding that because the precedent was well established and well known to Congress and to tribes, it could only be modified by Congress.

Tribal immunity applies to suits for damages, *e.g.*, *Kiowa Tribe* (vacating monetary judgments), as well as those for declaratory and injunctive relief, *e.g.*, *Bay Mills*, 572 U.S. 782 (vacating injunction).  It applies to contractual claims. *E.g.*, *Kiowa Tribe* (vacating judgment issued for breach of contract); *Lesperance v. Sault Ste. Marie Tribe of Chippewa Indians*, 259 F. Supp. 3d 713 (W.D. Mich. 2017) (because the Sault Ste. Marie Tribe limited its waiver for tort claims solely to claims brought in the Tribe's own court system, the federal court tort suit had to be dismissed); *Arizona v. Tohono O'odham Nation*, 818 F.3d 549 (9th Cir. 2016) (dismissing multiple off-contract claims based upon tribal immunity).

> **2.  State Court jurisdiciton over a tribe and a tribe's sovereign immunity are threshold issues of federal law which the State Court has refused to decide and which this Court has jurisdiction to decide.**

A tribe's sovereign immunity is a threshold jurisdictional issue under both federal and Michigan law.  That issue must be resolved *on the merits* before the Court proceeds to any other issue in the case.  *Spurr,* 936 F.3d at 483; *In re Greektown Holdings, LLC*, 917 F.3d 451, 466 (6th Cir. 2019); *Alvarado v. Table Mt. Rancheria*, 509 F.3d 1008, 1015-16 (9th Cir. 2007) ("[T]ribal immunity precludes subject matter jurisdiction in an action against an Indian tribe."); *Robbins v.*

*U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1080 (10th Cir. 2006); *Hagen,* 205 F.3d at 1043 (citing *Rupp v. Omaha Indian Tribe*, 45 F.3d 1241, 1244 (8th Cir. 1995)); *Am. Indian Agric. Credit Consortium v. Standing Rock Sioux Tribe*, 780 F.2d 1374 (8th Cir. 1985); *Chemehuevi Indian Tribe v. Cal. State Bd. Of Equalization*, 757 F.2d 1047, 1051 (9th Cir. 1985); *Ramey Constr. Co., Inc. v. Apache Tribe of the Mescalero Reservation*, 673 F.2d 315, 318 (10th Cir. 1982); Mich Ct. R. 2.116(1).

Because it is a threshold issue, "that means we must address it—and must do so first." *Spurr,* 936 F.3d at 483.  *See also Chemehuevi Indian Tribe*, 757 F.2d at 1051 (holding that a court "must address it first and resolve it irrespective of the merits of the claim").

This is so because sovereign immunity is "an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985) (emphasis in original).  "The Tribe's full enjoyment of its sovereign immunity is irrevocably lost once the Tribe is compelled to endure the burdens of litigation." *Kiowa Indian Tribe of Oklahoma v. Hoover,* 150 F.3d 1163, 1172 (10th Cir. 1998)' *Ute Indian Tribe*, 790 F.3d at 1005; *Vann v. Kempthorne*, 534 F.3d 741, 745 (D.C. Cir. 2008)*; Wisconsin v. Ho Chunk Nation,* 512, F.3d 921 (7th Cir. 2008); *In re Greektown Holdings, LLC*, 917 F.3d 451.

This point was recently reiterated by the United States Supreme Court in *Bay Mills*.  As the Court succinctly held:

> The upshot is this.  Unless Congress [or the tribe[8]] has authorized Michigan's suit, our precedents *demand* that it be dismissed.

*Bay Mills*, 572 U.S. at 791 (emphasis added).

---

[8] In *Bay Mills*, the sole issue was whether Congress had waived the Tribe's immunity and the Court's quote did not reference the second, and equally well-established exception—that a tribe can waive its own immunity, and that the Courts apply the same "clear and unequivocal standard," and must dismiss if there is no waiver.

That is the simple, well-established legal rule that applies to this case.  The Tribe has not authorized any suit in the Michigan Court, and the Developers' state court suit is therefore barred by federal law.

Before it could proceed past this threshold jurisidctional issue, the Developers had to prove to the State Court that either the United States or Kewadin has provided a clear and unequivocal waiver of sovereign immunity for suit in that court.  "The baseline position, we have often held, is tribal immunity, and 'to abrogate such immunity, Congress [or, where applicable, the tribe] must unequivocally express that purpose.'"  *Bay Mills*, 572 U.S. at 790 (quoting *C & L Enter., Inc. v. Citizen Band Potawatomi Tribe of Oklahoma*, 532 U.S. 411, 418 (2001)).  *See also Santa Clara Pueblo*, 436 U.S. at 58; *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Oklahoma*, 498 U.S. 505, 509 (1991)).  For any claims which the Developers were unable to plead and prove a clear and unequivocal waiver, the State Court lacked jurisdiction and was required to dismiss them.  *Bay Mills*, 572 U.S. at 794; *Kiowa Tribe*, 523 U.S. at 760; *Spurr*, 976 F.3d at 482-83; *Memphis Biofuels*, 585 F.3d at 919-20.  In determining the issue of waiver, a court cannot consider perceived inequities under the facts of the particular case.  *Ute Dist. Corp. v. Ute Indian Tribe*, 149 F.3d 1260, 1267 (10th Cir. 1998).

In the prior federal court litigation and then in the State Court, the Developers argued that they only had to plead that there was *some* waiver.  They claimed if there was *any* waiver, they could bring any claim, without limitation.  The Developers essentially argued that if there is any waiver of immunity, it must be interpreted as "in for a penny, in for a pound."  The settled law on sovereign immunity rejects that argument.  Instead, "whether a waiver of sovereign immunity has occurred is an inquiry separate and distinct from a waiver's scope," *In re Greektown Holdings, LLC*, 917 F.3d at 466, and the Developers would have to meet their burden, on the facts, to

22

establish that their claims are within the *limited scope* of the waiver in this contract.  *Spurr v. Pope,* 936 F.3d 478, 483 (6th Cir. 2019).  In this case, as in many contract claims against a governmental entity, the controlling issue is scope of the waiver.

This limitation is further shown by the NIGC's declination letter, Compl, Ex. 3, which expressly references the limited scope of the waiver, and makes clear that under the contract *the Developers cannot bring any claim for a lien or monetary damages if the Casino is not built*.  The conclusion in that letter is expressly contingent upon the "key provision" that the sole source for repaying is operating expenses from the casinos if they are built and that it "arises only if the planned facilities are ultimately completed and opened as contemplated and if certain financial tests are satisfied."  As the NIGC noted, those limitations were in black and white in the contract. The fact that the Developers now attempt to disavow those provisions cannot change the contract. That letter also stresses that a "key provision" of the contract bars the Developers encumbering any Casino property.  *Id.* at 2.  The Developers therefore cannot meet their burden to establish waiver of sovereign immunity, and the State Court's prior decision solely limited to whether the Developers claimed some waiver is contrary to the federal law that this Court must apply.

Concomitant with a tribe's authority to retain or waive sovereign immunity, it has the authority to impose absolutely any condition or limitation on its waiver of its sovereign immunity.

> Because a waiver of immunity is altogether voluntary on the part of a tribe, it follows that a tribe may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted.

*Mo. River Services, Inc. v. Omaha Tribe of Nebraska*, 267 F.3d 848, 852 (8th Cir. 2001) (quoting *Beers v. Arkansas*, 61 U.S. (20 How.) 527, 529 (1857)).  *See also Santa Clara Pueblo,* 436 U.S. 49 at 58; *Ute Indian Tribe*, 790 F.3d 1000; *California v. Quechan Tribe of Indians*, 595 F.2d 1153, 1154 (9th Cir. 1979) (Indian sovereign immunity is subject to all conditions and limitations the sovereign imposes); *Namekagon Dev. Co. v. Bois Forte Reservation Hous. Auth.*, 517 F.2d 508,

509 (8th Cir. 1979).  *See also Block v. North Dakota*, 461 U.S. 273, 287 (1983) (same, as applied to alleged federal consent to suit).

Applying the above law, even when a tribe itself files suit it does not waive its immunity to any counterclaims that are outside the scope of the tribe's own claims.  *Ute Indian Tribe*, 790 F.3d at 1009-10. (remanding for dismissal of counterclaims); *Oklahoma Tax Comm'n*, 498 U.S. at 509-510; *In re Greektown Holdings LLC*, 917 F.3d at 466; *Huron Potawatomi, Inc. v. Stinger*, 227 Mich. App. 127 (Mich. App. 1997).

Scope of waiver is resolved using the same presumptions and standards used  in determining whether there is any waiver.  "[I]f a tribe 'does consent to suit, any conditional limitation it imposes on that consent must be strictly construed and applied.'"  *Mo. River Services, Inc.*, 267 F.3d at 852 (quoting *Namekagon Dev. Co*., 517 F.2d at 509).  *See also Block*, 461 U.S. at 287; *Ute Indian Tribe*, 790 F.3d at 1010.

> **3.**     **This Court should enjoin each Defendant from taking any further action in the State Court suit because Kewadin is likely to prevail on its claim that the State Court suit is barred by supreme federal law.**

> **a.**     **Kewadin did not consent to State Court suit.**

As discussed above, the burden in this case is on the Developers to show a clear and unequivocal waiver of sovereign immunity.  Even though Kewadin did not have the burden, the contract language at issue here affirmatively shows that Kewadin did not waive sovereign immunity for suit in the State Court on any of the Developers' claims.  Section 6.3 of both Agreements provide:

> **Section 6.3.1: _Governing Law._** The Parties agree that any dispute arising out of or in connection with this Agreement of [sic] the other Transaction shall be resolved first pursuant to applicable federal law; second, pursuant to applicable State law; and third, pursuant to the applicable laws of the Tribe if no State or federal law applies. The parties designate the United States District Court for the Western District of Michigan as **_the_** forum for any litigation arising out of or relating to the Gaming Authority. Notwithstanding the foregoing, as to any

dispute to which the Uniform Commercial Code would apply, that Code, as adopted by the State, shall apply.

**Section 6.3.2: _Scope of Waiver_.** Subject to the provisions of Section 6.3, the Gaming Authority hereby expressly waives the jurisdiction of any courts of the Tribe and expressly provides a limited waiver of its sovereign immunity from suit and consents to suit _in accordance with and pursuant to the terms and provisions of Section 6.3.1_.

Section 6.3 could not be any clearer.  Section 6.3.2 expressly incorporates the limitations of 6.3.1 into the waiver of immunity, and section 6.3.1 expressly limits the parties to the federal forum.  Because there is no consent to State Court jurisdiction, this Court must enjoin the State Court proceedings and ultimately must instruct the State Court to dismiss the State Court action because that action is barred by federal law.  _E.g. Bay Mills_, 572 U.S. at 791.

Although the State Court refused to issue a written opinion, its oral statements show that it (_i_) did not decide jurisdiction at all, (_ii_) did not require a clear and unambiguous waiver of tribal immunity, (_iii_) did not consider the Developers' own prior acknowledgments to the NIGC that the Developers could not bring claims for monetary damages unless the casinos were built, and (_iv_) did not consider that both federal law and the contracts themselves expressly bar any lien on Tribal property.

The State Court based its oral statements on a substantial misstatement of the content of section 6.3.1 of the contracts.  Astonishingly, the State Court interpreted the choice of _law_ provision as a choice of _forum_ provision.  App. 6 at 24-25.  It said the choice of forum was first federal court, and second, state court.  That was plainly incorrect.  _E.g., Foster v. Foster_, 505 Mich. 151, 182 (2020) (concurring opinion discusses the distinction between choice of law and choice of forum); _Robert A. Hansen Fam. Tr. v. FGH Indus., LLC_, 279 Mich. App. 468, 476 (2008) (holding that Michigan Courts enforce a contractual choice of forum).  Parties regularly agree to one forum (arbitration, or a particular court) for jurisdiction, but then a different jurisdiction for

choice of law.  For example, every arbitration provision, either explicitly or implicitly chooses

arbitration for the forum, while applying the law of some other forum.  The State Court's statement

that choice of federal and then Michigan *law* nullifies the party's agreement to limit the forum to

a non-Michigan forum was a basic error  made without any legal citation whatsoever.

Here, unlike a standard  forum selection clause, the contract's forum limitation was

included as a condition on the waiver of the Tribe's immunity – and as discussed above, it must

be interpreted under the federal law applicable to tribal waivers to a foreign court's jurisdiction.

The contract says that for choice of *law* it is first federal law then state law.  But for *forum* section,

the contract unequivocally provides  only for federal court, and the contract expressly limits any

waiver of immunity to that forum.  The State Court's inquiry should have ended there.

But the Defendant Judge did not stop there, stating "[i]f you go to state law you *have* to go

to state court."  Ex. 6 at 25:16-17 (emphasis added).[9]  That is obviously wrong.  First, as noted

above, choice of law and choice of forum are not the same.  Second, any law-applying forum can

apply state law.  Federal courts and tribal courts do so on a daily basis.  Arbitrators do so in every

case before them.  The fact that the chosen forum would apply both federal and state law does not

support the State Court's conclusion that this requires or even implies agreement to a state forum.

The Developers did not contract for a state forum, and this Court is required to stop the State

Court's attempt to illegally use its judicial powers to force Kewadin to litigate there.

Kewadin's agreement  with the Developers to select a forum is commonplace and

enforceable.  "The history of sovereign immunity and the practical necessity of unfettered freedom

for government from crippling interferences require a restriction of suability to the terms of the

---

[9] Because the Judge expressly held that she was not ruling on subject matter jurisdiction, any statement by her related to jurisdiction is dicta.

consent, as to persons, _courts_ and procedure," and therefore the fact that a state has waived immunity into one court system does not permit suit in a different court system. *Great N. Life Ins. Co. v. Read*, 322 U.S. 47, 53–54 (1944) (emphasis added). Michigan itself imposes similar restrictions on suit for damages against the State. *E.g.,* Mich. Stat. 691.1410 (Michigan provides a limited waiver of immunity for tort claims, including, inter alia, limitations on the types of claims and limitations to a specific court – the state court of claims); *Gilmore v. O'Sullivan*, 106 Mich. App. 35 (Mich. App. 1981) (acknowledging the validity of the State's power to limit any waiver of immunity).

That the parties here agreed to federal court jurisdiction is not uncommon, nor is the fact that they did not agree to state court jurisdiction. In general, tribes do not want to litigate in state courts, and opposing parties do not want to litigate in tribal courts, leaving federal courts as the only remaining judicial forum. *Contracting with Indian Tribes and Resolving Disputes: Covering the Basics*, 2005 No. 5 RMMLF-INST Paper No. 11A, §III. And it is well-understood that parties' willingness to litigate some claims in federal court does itself not create federal court jurisdiction. *Id.* The Developers did not obtain a secondary forum or an agreement to arbitrate if federal jurisdiction was lacking. The Developers must abide by their agreement, live with the risk that they chose to take, and accept that under their contract federal law bars their attempt to bring suit in the State Court.

The State Court's refusal to follow federal law is a paradigmatic example of why Kewadin did not consent to State Court jurisdiction and why tribes in general are reluctant to consent to State Court jurisdiction. Under the operative facts here, Kewadin should have prevailed on a motion to dismiss with only minimal cost and expenditure of time. Instead, Kewadin has had to file multiple State Court motions and is currently being threatened with contempt and default

judgments, all because the State Court refuses to make the obvious ruling that supreme federal law bars State Court jurisdiction.

> ### 4. The casinos were never built and *ipso facto* there is no consent to any monetary claim.

As discussed in the statement of facts above, the Developers knowingly and intentionally entered into contracts that were high-risk and had the potential for a very high reward.  The risk was that they would not recover their investment or their hoped for 15-fold profits unless the Tribe was able to have land taken into federal trust ownership and deemed "gaming eligible" under federal law.  Only then would the downstate casinos be built and hopefully profitable, and only then would there any funds against which Developers could assert a monetary claim.  In the State Court action, the Developers audaciously seek the amount of profit that might have been generated if the risk had panned out.

Notably, the National Indian Gaming Commission held that the contract did not require federal approval because, *inter alia*, (i) each Developer's sole remedy was from the profits of a hoped for on-Reservation casino that now will not be built, (ii) the Developers had no right to any lien on the hoped-for casinos or on any other Kewadin or tribal property, and (iii) the Developers had no right to plan the casinos.  Compl., Ex. 3.  The Developers' disavowal of those contract limitations now renders the prior NIGC declaration letter a legal nullity. As the Developers now interpret the contract, the contract plainly would require NIGC approval, and the fact that it lacks that approval renders the contract, and the purported waiver of sovereign immunity therein, void *ab initio*.  Under federal law, "a management contract that has not been approved by the Chairman is void."  NIGC Bulletin 1994-5.  *See generally* Kevin K. Washburn, *The Mechanics of Indian Gaming Management Contract Approval*, 8 Gaming L. Rev. 333, 345 (2004).  See also, e.*g.*, *Cty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 240 (1985) ("*Oneida II*"); *Quantum Exploration,*

*Inc. v. Clark*, 780 F.2d 1457, 1459 (9th Cir. 1986), and cases cited therein (validity of alleged contract is "entirely dependent on the approval of the Secretary [of the Interior]."); *Wells Fargo Bank v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684, 702 (7th Cir. 2011); *Black Hills Inst. of Geological Research v. S.D. Sch. Of Mines and Tech.*, 12 F.3d 737, 742-44 (8th Cir. 1993); *Winnebago Business Committee v. Koberstein*, 762 F.2d 613, 615 (7th Cir. 1985); *Everglades Ecolodge at Big Cypress, LLC v. Seminole Tribe of Fla.*, 836 F. Supp. 2d 1296, 1305-1309 (S.D. Fla. 2011)(finding complete federal preemption and a lease of Indian lands, never approved by the Secretary of the Interior, to be void *ab initio*).

The risk the Developers willingly undertook is stated in the contracts in black and white. The Developers would only be able to recover their investment and have the potential for a bonanza profit if they provided the capital for the contemplated long process *and* if that long and risky process worked as everyone hoped it would.  Compl. Exs. 1& 2, recital I (the parties acknowledge the multiple difficult hurdles that would have to be cleared in order for the downstate casinos to generate money which was to be the sole sources for repayment); *id.* at §4.3 ("Under no circumstances shall the Tribe or the Gaming Authority be responsible or liable in any way, shape or form for the payment of the development fee from any other sources" than the operating profits after the downstate casinos open); *id.* at §6.3.3.  Section 6.3.3. states:

> ***Section 6.3.3: Procedural Requirements.*** The Gaming Authority's waiver of its sovereign immunity as to unconsented suit is effective if, and only if, each and every one of the following conditions is met:
>
> A.   The claim is made by a party designated under Section 6.3.5 hereof [sic], and not by any other person, corporation, partnership or entity, whatsoever;
>
> B.   The claim alleges a breach by the Gaming Authority of one or more specific obligations or duties assumed pursuant to the terms and provisions of this Agreement or the other Transaction Documents; and
>
> C.   The claim seeks money damages for noncompliance with the terms and performance of this Agreement of any of the Transaction Documents, and/or *injunctive relief related to the claimed noncompliance; provided, however, that the property, assets or funds specifically pledged and*

> assigned to satisfy any judgment Developer secures against the Gaming
> Authority under this Agreement shall be limited to the Operating Profits
> and the Equipment.

Exs. 1 & 2 (emphasis added).

Section 1.2.2 of the contracts reiterated that same limitation.  It provided that for any funds the Developers provided before construction, "the *sole source for repayment* shall be the Operating Profits and that it is subject to the limitations on repayment referenced in Section 1.2.6 of this Agreement."  (emphasis added).

The non-recourse promissory notes issued under Article 1 (i.e., the Pre-Construction Period) incorporate Section 1.2.6 by reference and expressly recognize that payments made to satisfy such loans shall flow only from the "'Operating Profits' derived from the Gaming Authority from operations at the Temporary Facility and the Facility."

There were no guarantees, but rather a known risk that all money the Developers *and* Kewadin invested might ultimately be completely lost.  *E.g.*, Exs. 1& 2, §4.1.3 (stating that because of the "*risks*, obligations, and liabilities" the Developers were taking, they would receive 14% of the operating profits from the downstate casinos for seven years) (emphasis added).

As the Developers are forced to admit in this case, they knowingly agreed to that risk.  State Ct. Compl. ¶10 (the Developers state that "JLLJ and Lansing Future were to be repaid their advances and profits from Casino revenues."); *id.* at ¶18 (noting that any compensation to the Developers would come from "a share of the revenues of the [downstate] casinos"); *id.* at ¶40 (admitting: "as a *consequence* [of the downstate casinos not yet being authorized] neither JLLJ nor Lansing Future has been repaid the funds advanced or received the substantial revenues JLLJ and Lansing Future were to be paid from the revenues of the temporary casino") (emphasis added); *id.* at ¶43.  In their State Court complaint, the Developers did not make any claim whatsoever for money from the "operating profits."  That is because, as they also admit, there are no "operating

profits." Kewadin is therefore exceedingly likely to prevail on the merits of its argument that federal law bars the Developers' claims for money from sources other than "operating profits" from the two specified downstate casinos on tribal trust lands.

Kewadin is also likely to prevail because the State Court's discovery order violates the Tribe's right to make its own laws and be ruled by them. In their requests for discovery, the Developers sought incredibly broad discovery from the Tribe, even though the Developers had previously acknowledged that the Tribe had not waived its sovereign immunity and was not even a party to the case. This included a demand that the Tribe gather nearly all of its financial records and other sensitive tribal documents submitted to state and federal officials and hand them over to Defendants. *See* p.6-7 *supra* (discussing broad discovery request). Kewadin objected to that discovery because, inter alia, any request to the Tribe would have to be made under the Tribe's freedom of information law. *E.g.*, *Williams v. Lee*, 358 U.S. 217 (1959) (the civil law applicable to a tribe or tribal members on the Tribe's Reservation is the Tribe's own laws, not state laws); *Harvey v. Ute Indian Tribe of the Uintah and Ouray Reservation*, 416 P.3d 401 (Utah 2017) (tribal court, not state court, had to determine whether tribal officials were acting within the scope of their tribal authority); Cohen's Handbook of Federal Indian Law § 706[2] (tribal law applies to matters within the Tribe's jurisdiction). This Court must enjoin Defendants' attempt to impose foreign state law to the actions of the non-party Tribe on the Tribe's lands.

### C. KEWADIN WILL BE IRREPARABLY HARMED IF INJUNCTIVE RELIEF IS NOT GRANTED, AND THAT HARM IS IMMINENT.

As then-Circuit Judge Gorsuch noted in *Ute Indian Tribe*, injury to a tribe's sovereign rights is irreparable injury, 790 F3d at 1005-06. As also discussed above, a tribe's sovereign immunity or its right to be free from judicial proceedings before a court that lacks adjudicatory jurisdiction over the Tribe is irreparably lost if the State Court nevertheless proceeds. If

Defendants are not enjoined, Kewadin and the Tribe will be deprived of their right under federal law to make their own tribal laws and be governed by those tribal laws. That deprivation is imminent, because, as noted *supra*, Defendant Judge has set a hearing for February 9, 2022 at which time the State Court plans to consider how to punish the Kewadin for asserting the State Court lacks jurisdiciton and that the State Court erred by refusing to even decide whether it has jurisdiction.

### D.   THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY SUPPORT INJUNCTIVE RELIEF.

The discussion above demonstrate the balance of harms and public interest factors strongly favor injunctive relief.  The threshold issue is whether the State Court has subject matter jurisdiction.  There is no "public interest" in permitting a State Court to refuse to decide that threshold issue and attempt to assert authority over a foreign sovereign as a way of evading that threshold issue.  To the contrary, the rule in Michigan and every other state is that, in every case – not just in cases involving the intersection of state and tribal authority – the public interest requires a Court to first decide jurisdiction as a threshold issue.  And the public interest requires this Court to enjoin the State Court proceedings until this Court has obtained full briefing, at which point this Court will conclude that the Defendants must be permanently enjoined because they are in violation of federal law.

### CONCLUSION

For the reasons above, this Court should issue a temporary restraining order or preliminary injunction preserving the status quo and enjoining the State Court proceedings until this Court resolves the threshold issues the State Court refused to decide—whether federal law bars State Court jurisdiction and whether sovereign immunity bars the State Court suit.

Dated February 4, 2022.

/s/ Jeffrey S. Rasmussen
Jeremy J. Patterson
Jeffrey R. Rasmussen
Frances Bassett
Robert T. Lawrence
Patterson Earnhart Real Bird & Wilson
1900 Plaza Drive
Louisville, CO  80027
Telephone: 303.926.5292
jpatterson@nativelawgroup.com
jrasmussen@nativelawgroup.com
fbassett@nativelawgroup.com
rlawrence@nativelawgroup.com
*Attorneys for Plaintiff*